## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| **Dianna G. Gardner**<br>An incompetent,<br>by and through her Attorney-in-Fact,<br>Kelly Strunk<br>2222 Springdale Rd.<br>Cincinnati, OH 45231<br><br>        **Plaintiff - Appellant**<br><br>**vs.**<br><br>**Maureen M. Corcoran,**<br>in her capacity as Director<br>of the Ohio Department of Medicaid,<br>50 West Town Street<br>Suite 400<br>Columbus, Ohio 43215<br><br>        **Defendant - Appellee** | **Case No.: 1:20-cv-209**<br><br>**Judge: _____**<br><br><br>**CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

### INTRODUCTION

1.      This action seeks permanent injunctive relief against Defendant, Maureen M. Corcoran, in her capacity as Director of the State of Ohio Department of Medicaid, for Ohio's policy which denies long-term care Medicaid benefits to the Plaintiff and all similarly situated Ohioans who own real estate and who have complied with federal law to exclude said real estate by listing it for sale.

2.      The Defendant has adopted no regulation to determine when real property is unsaleable and is therefore excluded as a countable resource for eligibility purposes as required by 42 U.S.C. § 1382b(b)

3.      Further, Defendant has a policy that applicants for the long-term care Medicaid program with real property valued over $2,000 do not qualify, even when the applicant has made reasonable efforts to sell in compliance with federal regulations. 20 C.F.R. § 416.1245(b).

4.      The Defendant has nullified the rights of the Plaintiff and all other similarly situated persons who would be eligible for assistance under the Medicaid program if the methodology required under federal law for resource eligibility were used.

5.      Plaintiff seeks class certification, permanent injunctive and declaratory relief from the Defendant's policies which are contrary to federal law.

## JURISDICTION

6.      Plaintiff brings this action pursuant to 42 U.S.C. § 1983; 42 U.S.C. § 1396a(a)(10)(A)(ii)(X), 42 U.S.C. § 1396a(m)(1), and 42 U.S.C. § 1396a(r) of the Social Security Act.  Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343, 2201 and 2202. Venue in this District is proper under 28 U.S.C. § 1391(b) as the acts complained of occurred in this District and the Defendant may be found in this District.

## PLAINTIFF

7.      The Plaintiff, Dianna G. Gardner, is a 68 year old resident of Hamilton County, Ohio.  As a result of complications from a stroke, Plaintiff  is so mentally impaired as to be unable to understand the nature of her affairs or to validly execute any contract.

8.      Plaintiff was admitted to Burlington House Rehab and Alzheimer's Center (Burlington) skilled nursing facility on March 19, 2019, where she continues to reside to the present.

9.      Plaintiff suffers from complications as a result of a stroke.  As a result of these

complications, she requires the care she receives in a skilled nursing facility and would be at risk if she were discharged. Burlington has attempted to discharge Plaintiff because her Medicaid application was denied.

10.     Plaintiff's daughter, Kelly Strunk, provided care to Plaintiff prior to her admission to Burlington. Plaintiff designated Ms. Strunk as her Attorney-in-Fact by a Power of Attorney Plaintiff executed on January 30, 2018.

11.     At the time of her admission to Burlington, Plaintiff owned and continued to own real property in West Virginia, valued at $80,200 according to the county auditor.

12.     Plaintiff continuously listed the real property in West Virginia for sale with a realtor in beginning December of 2018.

13.     Plaintiff brings this action by and through her Attorney-in-Fact and daughter, Kelly Strunk.

## DEFENDANT

14.     The State of Ohio participates in the Federal Medicaid program. The Ohio Department of Medicaid (ODM) is the single state agency for the Medicaid Program in the State of Ohio and is required, pursuant to O.R.C. § 5162.03 and O.A.C. § 5160:1-1-01, to provide medical assistance in accordance with the federal Medicaid statute, Title XIX of the Social Security Act, 79 Stat. 286 (1965).

15.     Defendant, Maureen M. Corcoran, as director of the ODM, is responsible for the administration of the Medicaid program in Ohio.

16.     As the executive head of ODM under O.R.C. § 5160.03, she is responsible for the supervision and operation of the Medicaid program in Ohio in accordance with the applicable federal Medicaid statutes and regulations.

17.     Defendant, Maureen M. Corcoran, is also responsible for ensuring that other state and county agencies and subdivisions with whom ODM contracts to administer the Medicaid program comply with all applicable Medicaid laws and policies pursuant to O.R.C. § 5162.03.

18.     Defendant has acted and continues to act at all times relevant hereto in her official capacity and under color of state law.

## CLASS ALLEGATIONS

19.     The class consists of all Ohio residents who are ineligible for long-term care Medicaid because they own real property which would be excluded if they complied with 20 C.F.R. § 416.1245.

20.     According to the United States Census (Census) analysis for 2016, for all United States households where the age of the householder was 65 or older, 76.9% of elderly householders had equity in their own home, 9.6% owned equity in rental property, and 11% owned equity in other real property.  (Exhibit D).  The Miami University Scripps Gerontology Center (Miami University) issued a report detailing the demographics of Ohio certified nursing facility residents for the three-month period of April through June of 2016.  (Exhibit E, pg. 15, Table 8).  According to the report, 81,612 residents aged 65 or older stayed at an Ohio certified nursing facility during the three-month period measured.  *Id*.

21.     Comparing the Miami University statistics with the Census statistics, of all Ohio nursing facility residents measured during a three-month period, an estimated 62,759 have equity in a home; an estimated 7,834 have equity in a rental property; and an estimated 8,977 have equity in other real property.  These estimates do not include residents living at

residential care facilities or at home who may qualify for long-term care Medicaid under Home and Community Based Services (HCBS) Waiver programs.

22.    Under Ohio's Medicaid eligibility rules, if the home, rental property, or other real property of an individual is not excluded as a countable resource under some other provision, and if the equity of the real property is above $2,000, then the individual is subject to permanent denial of Medicaid benefits for so long as the real property is unsaleable. O.A.C. § 5160:1-3-05.1(B)(8)(a). Given the numbers of Ohio residents in nursing facilities, other long-term care facilities, or receiving care at home, the size of the proposed class is so numerous as to make it impracticable to bring each claim individually.

23.    There are questions of fact and law common to the class as a whole. Common questions of fact include whether the Defendant has engaged in a pattern and practice of denying, discouraging, or ignoring requests for Medicaid by including real property that the applicant is making reasonable efforts to sell as a countable resource. Common questions of law include whether Defendant's policy of refusing to exclude real property that a long-term care Medicaid applicant is making reasonable efforts to sell violates 42 U.S.C. § 1396a(a)(10)(A)(ii)(X), 42 U.S.C. § 1396a(m)(1), and 42 U.S.C. § 1396a(r) of the Social Security Act.

24.    The claims of the named Plaintiff, Dianna Gardner, are typical of those of the members of the class.

25.    The named Plaintiff will fairly and adequately protect the interests of the class because she is a member of the class and has no adverse interest to the class.

26.    Plaintiff's counsel has experience with litigation of this nature, and will vigorously pursue the interests of the class.

27.     Defendant has acted on grounds generally applicable to the class represented by the named Plaintiff.

28.     Defendant's actions make appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

## FACTUAL ALLEGATIONS

29.     On August 20, 2019, Ms. Gardner applied for long-term care Medicaid.  Ms. Gardner was age 67 at the time of application. The County Agency determined Ms. Gardner was ineligible because she owned real property in West Virginia that the County Auditor valued at $80,200, making her over-resourced. (Exhibit A).  As a result of the Medicaid denial, Ms. Gardner's nursing facility, Burlington, made multiple attempts to discharge Ms. Gardner.

30.     Ms. Gardner had continuously listed the West Virginia real property with a real estate agent since December of 2018.  (Exhibit B).

31.     To be eligible for long-term care Medicaid benefits, federal laws and regulations mandate the use of eligiblity standards set by SSI to determine whether real property is a countable resource, 20 C.F.R. § 416.1245.

32.      Ms. Gardner would have been eligible for  Medicaid benefits from the time she entered the nursing facility as the real property she owned was not a countable resource due to her reasonable efforts to sell.

33.     Ms. Gardner requested a state hearing and administrative appeal. The state hearing and administrative appeal decisions, exhibit A, affirmed Defendant's policy of wrongfully refusing to apply the correct eligibility standard, thereby denying  Ms. Gardner needed Medicaid benefits.

## CLAIMS FOR RELIEF

### *CLAIM ONE*

34.     Plaintiff alleges and incorporates by reference paragraphs 1 - 33 above as if fully rewritten herein.

35.     Title XIX of the Social Security Act, 79 Stat. 286 (1965), ("the Medicaid Act"), at 42 U.S.C. §§ 1396 et seq., was enacted as a joint obligation by the federal  government and the States that agreed to provide medical assistance to low income and needy individuals, who would otherwise be unable to pay for necessary health care. States do not have to participate in Title XIX, but once a state elects to participate in the program, the state is bound by the federal law and regulations set forth in the Social Security Act and its implementing regulations.

36.     42 U.S.C. § 1396a(a)(10)(A)(ii)(X), 42 U.S.C. § 1396a(m)(1), and 42 U.S.C. § 1396a(r), require states administering long-term care Medicaid programs to use the SSI resource eligiblity guidelines found at 42 U.S.C. § 1382b.

37.     42 U.S.C. § 1396a(r)(2)(A) describes the methodology to be used in determining resource and income eligibilty for certain individuals and specifies the following individuals to be covered by that methdology:

> (2)(A) The methodology to be employed in determining income and resource eligibility for individuals under subsection . . . **(a)(10)(A)(ii)** . . .  or under section 1396d(p) of this title  . . . shall be no more restrictive, than the methodology—
>
> > (i) in the case of groups consisting of aged, blind, or disabled individuals, under the supplemental security income program under subchapter XVI,

(Bold emphasis added).

38.     42 U.S.C. § 1396a(a)(10)(A)(ii)(V) mandates  the State plan for medical assistance provide assistance to those-

(V) who are in a medical institution for a period of not less than 30 consecutive days (with eligibility by reason of this subclause beginning on the first day of such period), who meet the resource requirements of . . . the supplemental security income program, …

39.    42 U.S.C. § 1396a(a)(10)(A)(ii)(X) also mandates the state plan provide medical

assistance to individuals described in 42 U.S.C. § 1396a(m):

(1) Individuals described in this paragraph are individuals—

(A) who are 65 years of age or older or are disabled individuals (as determined under section 1382c(a)(3) of this title),
            *                    *                    *
(C) whose resources (as determined under section 1382b of this title for purposes of the supplemental security income program) do not exceed (except as provided in paragraph (2)(B)) the maximum amount of resources that an individual may have and obtain benefits under that program.

40.    The statutory mandates for resource eligibility under the SSI program are

found at 42 U.S.C. § 1382b(b), which states:

(1) The Commissioner of Social Security shall prescribe the period or periods of time within which, and the manner in which, various kinds of property must be disposed of in order not to be included in determining an individual's eligibility for benefits. ...

(2) Notwithstanding the provisions of paragraph (1), the Commissioner of Social Security shall not require the disposition of any real property for so long as it cannot be sold because . . . (C) as determined under regulations issued by the Commissioner of Social Security, the owner's reasonable efforts to sell it have been unsuccessful.

41.    The Commissioner of Social Security adopted a regulation that determines when

real property is excluded as a resource due to the owner's reasonable efforts to sell:

(1) Excess real property **is not included in countable resources** for so long as the individual's reasonable efforts to sell it have been unsuccessful.
            *                    *                    *
 (3) Reasonable efforts to sell property consist of taking all necessary steps to sell it in the geographic area covered by the media serving the area in which the

property is located, unless the individual has good cause for not taking these steps. **More specifically, making a reasonable effort to sell means that**:

> (i) Except for gaps of no more than 1 week, **an individual must attempt to sell the property by listing it with a real estate agent** or by undertaking to sell it himself;

> (ii) Within 30 days of receiving notice that we have accepted the individual's signed written agreement to dispose of the property, and absent good cause for not doing so, the individual must:

>> (A) List the property with an agent; or

>> (B) Begin to advertise it in at least one of the appropriate local media, place a "For Sale" sign on the property (if permitted), begin to conduct "open houses" or otherwise show the property to interested parties on a continuous basis, and attempt any other appropriate methods of sale; and

> (iii) The individual accepts any reasonable offer to buy and has the burden of demonstrating that an offer was rejected because it was not reasonable. If the individual receives an offer that is at least two-thirds of the latest estimate of current market value, the individual must present evidence to establish that the offer was unreasonable and was rejected.

20 C.F.R. § 416.1245(b). (Bold emphasis added).

42.     Ohio's agreement to participate in the Medicaid program is set out in its Medicaid State Plan (State Plan), which was accepted by the Centers for Medicare and Medicaid Services (CMS).  (Exhibit C).  In said plan, the State of Ohio has agreed it would provide Medicaid assistance to residents of nursing facilities, citing to 42 U.S.C. § 1396a(a)(10)(A)(ii)(V).  Ohio Medicaid State Plan, Section 2.2, Attachment A, page 19.  (Exhibit C).

43.     Ohio's State Plan specifies ODM will comply with  SSI resource eligibilty rules when determining resource eligibilty for long-term care Medicaid applicants.  Ohio Medicaid State Plan, Section 2.2, Attachment A, page 6; Ohio Medicaid State Plan, Section 2.2,

Attachment A, page 9c; Ohio Medicaid State Plan, Section 2.2, Attachment A, page 19. (Exhibit C).

44.    Plaintiff continuously listed her West Virginia real property for sale with a real estate agent before and during her application for long-term care Medicaid, thereby meeting the requirement to make a reasonable effort to sell the real property and excluding the real property as a countable resource under 20 C.F.R. § 416.1245(b).

45.    Defendant's policy of denying eligibility for long-term care Medicaid by counting an applicant's real property, despite the applicant meeting the resource requirements for excluding said real property under federal laws and regulations, violates the Plaintiff's federal right to Medicaid coverage of her long-term care.

*CLAIM TWO*

46.    Plaintiff alleges and incorporates by reference paragraphs 1 - 45 above as if fully rewritten herein.

47.    In violation of 42 U.S.C. §1983, Defendant, while acting under color of state law, Has denied the Plaintiff rights, privileges and immunities secured by federal law, i.e. the Plaintiff's federal right to the coverage of her long-term care pursuant to Social Security Act 42 U.S.C. § 1396a(a)(10)(A)(ii)(X), 42 U.S.C. § 1396a(m)(1), and 42 U.S.C. § 1396a(r).

**<u>REQUEST FOR RELIEF</u>**

WHEREFORE, Plaintiff asks this Court to grant the following relief:

1.    An order certifying this action as a class action pursuant to FRCP 23(b)(1) or (2).

2.    Declaratory Relief that the policy of the Defendant of denying eligibility for Long-term care Medicaid due to the value of an applicant's real property, despite the applicant meeting the requirements for excluding said real property under the State Plan as described in federal law and regulations, violates Social Security Act

42 U.S.C. § 1396a(a)(10)(A)(ii)(X), 42 U.S.C. § 1396a(m)(1), and 42 U.S.C. § 1396a(r).

3.     Permanent Injunction requiring the Defendant to modify its policies and procedures to utilize the methodology for resource eligibility excluding real property so long as the applicant is using reasonable efforts to sell as provided in 20 C.F.R. § 416.1245(b).

4.     Plaintiff's reasonable attorney fees and costs incurred in bringing this action.

5.     Grant Plaintiff any and all other relief to which she may be entitled.

Respectfully submitted,

/s/ Matthew B. Barnes
Matthew B. Barnes, Esq. (0090910)
Trial Attorney for Plaintiff
Pro Seniors, Inc
7162 Reading Road, Suite 1150
Cincinnati, Ohio 45237
(513) 458-5510
E-mail: mbarnes@proseniors.org

/s/ Miriam H. Sheline
Miriam H. Sheline, Esq. (0018333)
Co-counsel for Plaintiff
Pro Seniors, Inc
7162 Reading Road, Suite 1150
Cincinnati, Ohio 45237
(513) 458-5509
E-mail: msheline@proseniors.org

OHIO DEPT. OF JOB AND FAMILY SERVICES
BUREAU OF STATE HEARINGS
P.O. BOX 182825
COLUMBUS, OHIO 43218-2825

# Exhibit A

HAMILTON CDJFS

**Ohio Department of Job and Family Services**
**Bureau of State Hearings**

State Hearing Decision

In the matter of:    Dianna Gardner

County:              Hamilton                    Case Number:  6079634 - Ohio Benefits

| Appeal | Program | Disposition | Compliance | OB Person |
|--------|---------|-------------|------------|-----------|
| 3517999 | MED-E | OVR | Not Required | Dianna Gardner |

Request Date:   10/23/2019
Hearing Date:   12/03/2019                    Hearing Officer:  Lauren  Foster
Mail Date:      01/16/2020

English

### This information is about your appeal.
### Please read all pages.

This is an important document regarding your appeal.  This document may require you to take an action such as sign, date, and/or complete and return it.  You can reapply at any time if your benefits were denied or stopped.

If you need this document translated into your preferred language, contact the ODJFS Bureau of State Hearings at 1-866-635-3748.

If you believe you have been discriminated against or if you have not been provided with an interpreter or a translation of this document, and you wish to file a complaint, contact the ODJFS Bureau of Civil Rights at 1-866-227-6353.

## Issue

Appeal Number: 3517999, Medicaid Eligibility Issues, Denial - LTCF

Was the denial of the Appellant's application for Medicaid, because the Appellant's countable resources exceed program eligibility standards, supported by the County Department of Job and Family Services (Agency)?

After careful consideration of the information presented during this state hearing, I found that the denial was correct.

## Procedural Matters

The Appellant's attorney was present at the hearing. The Agency was represented by Tamara Ennix. All parties were sworn in.

## Findings of Fact

1. On August 20, 2019, the Appellant applied for nursing facility-based Medicaid.
2. The Appellant was admitted to the nursing facility on March 19, 2019.
3. The Appellant owns a residence in West Virginia. The value of the home on the auditor's website is $80,200. The Appellant does not intend to return to the home.
4. The home has been listed for sale since December 2018. As of the date of the hearing, the house was listed at slightly less than the value listed on the auditor's website due to the home's failure to sell.
5. On September 13, 2019, the Agency mailed the Appellant a notice denying her Medicaid eligibility due to the value of the home exceeding the resource limit of $2,000 for an individual.

## Conclusion of Policy

## Policy

"Resource limit" means the maximum combined value of all resources an individual can have an ownership interest in and still qualify for medical assistance. (a) For an individual, the resource limit is two thousand dollars. (b) For a married couple, whether both are eligible or one is ineligible, the resource limit is three thousand

dollars. (c) A child living with a parent is considered to be an individual and has a resource limit of two thousand dollars. Ohio Admin. Code §5160:1-3-05.1(B)(8).

"Resources" means cash, funds held within a financial institution, investments, personal property, and real property an individual and/or the individual's spouse has an ownership interest in, has the legal ability to access in order to convert to cash, and is not legally prohibited from using for support and maintenance. Ohio Admin. Code § 5160:1-1-01(B)(72).

"Home", for the purpose of this rule, means any property in which an individual has an ownership interest in and which serves as the individual's principal place of residence. Home includes the structures and land appertaining to the home property. Appertaining land must adjoin the land on which the home property is located and must not be separated by intervening land property owned by others. "Principal place of residence" means the dwelling the individual considers his or her established or principal home and to which, if absent, he or she intends to return. Principal place of residence can be real or personal property, fixed or mobile, and located on land or water. The home lived in, owned by, and considered the principal place of residence by the individual, the couple, or the parents with whom the eligible child is living is an excluded resource, regardless of value. Ohio Admin. Code § 5160:1-3-05.13.

The home is no longer considered to be the principal place of residence and shall be treated as a countable resource if the individual does not intend to return to the home. If the individual leaves the home with no intentions of returning, the home remains an excluded resource for as long as:
(a) A spouse or dependent relative of the individual continues to live there while the individual is receiving long-term care services.
(b) Its sale would cause undue hardship, due to loss of housing for co-owner of the property.
(c) The individual leaves his or her home due to domestic abuse and has not established a new principal place of residence, or has not taken action to render the home no longer excludable.
(d) The property satisfies the provisions governing the treatment of property essential for self-support described in rule 5160:1-3-05.19 of the Administrative Code. Ohio Admin. Code § 5160:1-3-05.13.

## Analysis

Appeal Number: 3517999, Medicaid Eligibility Issues, Denial - LTCF

At issue is whether the Agency correctly determined that the Appellant's resources exceeded the resource limit of $2,000 for an individual to qualify for nursing facility-based Medicaid. "Resources" means cash, funds held within a financial institution, investments, personal property, and real property an individual and/or the individual's spouse has an ownership interest in, has the legal ability to access in order to convert to cash, and is not legally prohibited from using for support and maintenance.

The home lived in, owned by, and considered the principal place of residence by the individual, the couple, or the parents with whom the eligible child is living is an excluded resource, regardless of value. The home is no longer considered to be the principal place of residence and shall be treated as a countable resource if the individual does not intend to return to the home. If the individual leaves the home with no intentions of returning, the home remains an excluded resource for as long as: (a) A spouse or dependent relative of the individual continues to live there while the individual is receiving long-term care services; (b) Its sale would cause undue hardship, due to loss of housing for co-owner of the property; (c) The individual leaves his or her home due to domestic abuse and has not established a new principal place of residence, or has not taken action to render the home no longer excludable; or (d) The property satisfies the provisions governing the treatment of property essential for self-support.

In this case, the Agency determined that the Appellant's countable resources consisted of a home in West Virginia valued at $80,200. The Appellant's attorney agreed that at this time, the Appellant does not intent to return to the home. The home does not meet any of the criteria to be excluded as a resource because a spouse, dependent relative, or co-owner is not currently residing there; the Appellant did not leave the home due to domestic abuse; and there was no evidence to suggest that the property should be considered essential for self-support.

The Appellant's attorney argued that the home should nonetheless be excluded as a resource because as of the date of the hearing, the home had been for sale for almost a year and had failed to sell. The attorney maintained that the home's failure to sell demonstrated that the Appellant does not actually have the legal ability to convert the home to cash. While I do not dispute that the property may be very difficult to sell, I cannot find that the home's failure to sell thus far indicates that the Appellant is legally unable to complete the sale of the home to convert it to cash. Based on the evidence and testimony, I must conclude that the home does not meet

any of the criteria to be excluded as a resource, and therefore, the Agency correctly included it and determined that the Appellant's resources exceeded the $2,000 limit. The Agency's denial is correct.

## **Hearing Officer's Recommendation**

Appeal Number: 3517999
Based on the record and policy before me, I recommend that appeal 3517999 be Overruled.

## **Final Administrative Decision and Order**

Regarding appeal number 3517999, I find the Hearing Officer's decision to be supported by the evidence and regulations. The recommendations above are adopted, and the appeal is Overruled.

Margaret Lisa Martinez
Hearing Authority
01/16/2020

## Notice to Appellant

This is the official decision of your state hearing. It informs you of the decision and order in your case. Papers and materials introduced at the hearing, known as "exhibits," make up the hearing record. The hearing record is maintained by the Ohio Department of Job and Family Services. If you would like a copy of the official record, please call the ODJFS hotline at 1-866-635-3748.

Important Notice:  If you disagree with this decision, you, or your authorized representative, may request an administrative appeal about this notice. Contact us using one of the following methods:
    Email - bsh@jfs.ohio.gov.  In the subject, put "Administrative Appeal Request".
    Fax -  (614) 728-9574
    Mail - ODJFS Bureau of State Hearings, P.O. Box 182825, Columbus, Ohio 43218-2825.
Your administrative appeal request should include a copy of this notice and the reason you think it is wrong. Your written request must be received by the Bureau of State Hearings within 15 calendar days from the mailing date of this notice. (If the 15th day falls on a weekend or holiday, this deadline is extended to the next work day.)

Unless you request an administrative appeal, this notice is a final and binding decision about your state hearing request. Any fair hearing benefits you receive will end. This may also mean the local agency can  go ahead with the action it was planning to take. Additionally, you may have to pay back the continuing benefits you received as part of the state hearing process.

You can ask your local Legal Aid program for free help with your case. Contact your local Legal Aid office by phoning 1-866-LAW-OHIO (1-866-529-6446) or by searching the Legal Aid directory at http://www.ohiolegalservices.org/programs  on the internet.

 This decision was sent to the following:

 MATTHEW BARNES
 HAMILTON CDJFS
 DIANNA G GARDNER

**Appendix**

**<u>Appellant Exhibits</u>**

1. Request-SH (17 pages)

**<u>Agency Exhibits</u>**

A. Complete Appeal Summary (46 pages)

B. Appeal Summary (33 pages)

OHIO DEPT. OF JOB AND FAMILY SERVICES
BUREAU OF STATE HEARINGS
P.O. BOX 182825
COLUMBUS, OHIO 43218-2825

MATTHEW BARNES
BARNES, MATTHEW
7162 READING RD
STE 1150
CINCINNATI OH 45237-3849

## Ohio Department of Job and Family Services
## Bureau of State Hearings

### Administrative Appeal Decision

In the matter of:  Dianna Gardner

County:  Hamilton                    Case Number:  6079634 - Ohio Benefits

| Appeal | Program | Disposition | Compliance | OB Person |
|--------|---------|-------------|------------|-----------|
| 3517999 | MED-E | AFF | Not Required | Dianna Gardner |

Request Date:  01/30/2020
Mail Date:  02/14/2020



English

## This information is about your appeal.
## Please read all pages.

This is an important document regarding your appeal.  This document may require you to take an action such as sign, date, and/or complete and return it.  You can reapply at any time if your benefits were denied or stopped.

If you need this document translated into your preferred language, contact the ODJFS Bureau of State Hearings at 1-866-635-3748.

If you believe you have been discriminated against or if you have not been provided with an interpreter or a translation of this document, and you wish to file a complaint, contact the ODJFS Bureau of Civil Rights at 1-866-227-6353.

JFS 04013 (Rev 01/2015)          3517999

## SUMMARY

Appellant appeals the state hearing decision issued on January 16, 2020, for appeal no. 3517999, which overruled an appeal regarding the denial of Long Term Care Facility (LTCF) Medicaid due to excess resources.

## ANALYSIS

On August 20,2019, Appellant applied for LTCF Medicaid. Appellant was admitted to a nursing facility (NF) on March 19, 2019. Appellant owns a home in West Virginia. The value per the auditor is $80,200. Appellant does not intend to return to the home. The home has been listed for sale since December 2018. As of the hearing the home was still listed but at a slightly lower amount. On September 13, 2019, the Agency mailed Appellant a notice denying the application for LTCF Medicaid due to excess resources.

Ohio Admin. Code 5160:1-3-05(B)(8) provides for a resource limit of $2,000 for an individual and $3000 for a couple.

Ohio Admin. Code 5160:1-1-01(B)(72) provides:

*(72) "Resources" means cash, funds held within a financial institution, investments, personal property, and real property an individual and/or the individual's spouse has an ownership interest in, has the legal ability to access in order to convert to cash , and is not legally prohibited from using for support and maintenance.*

Ohio Admin. Code 5160:1-3-05.13 provides:

*(A) This rule describes the treatment of an individual's home for purposes of determining eligibility for medical assistance.*
*(B) Definitions.*
*(1) "Home", for the purpose of this rule, means any property in which an individual has an ownership interest in and which serves as the individual's principal place of residence. Home includes the structures and land appertaining to the home property. Appertaining land must adjoin the land on which the home property is located and must not be separated by intervening land property owned by others.*
*(2) "Principal place of residence" means the dwelling the individual considers his or her established or principal home and to which, if absent, he or she intends to return. Principal place of residence can be real or personal property, fixed or mobile, and located on land or water.*
*(a) Only one living place may be established as the principal place of residence.*
*(b) The administrative agency must obtain a signed statement, declaring the principal place of residence, when there is an indication the individual resides in or has ownership of more*



than one place.

(C) The home lived in, owned by, and considered the principal place of residence by the individual, the couple, or the parents with whom the eligible child is living is an excluded resource, regardless of value.

(1) For the value of the home to be excluded:

(a) The home must be the individual's, the individual's spouse's, or the parents' with whom the eligible child is living principal place of residence; and

(b) The deed to the home must be in the individual's, individual's spouse's, or the eligible child's parents' name; or

(c) The home must be deeded to a revocable trust so long as the principal of the trust remains a resource of the individual or the individual's spouse.

(2) The home is no longer considered to be the principal place of residence and shall be treated as a countable resource if the individual does not intend to return to the home.

(3) A temporary absence from the home does not affect the principal place of residence exclusion so long as the individual provides a signed statement of his or her intentions to return to the home and has not established permanent residence elsewhere.

(4) If the individual leaves the home with no intentions of returning, the home remains an excluded resource for as long as:

(a) A spouse or dependent relative of the individual continues to live there while the individual is receiving long-term care services, in accordance with Chapter 5160:1-6 of the Administrative Code.

(i) Dependency may be of any kind (e.g. financial, medical, etc.).

(ii) Relative means:

(a) Child, stepchild, or grandchild;

(b) Parent, stepparent, or grandparent;

(c) Aunt, uncle, niece, or nephew;

(d) Brother, sister, stepbrother or stepsister, half brother or half sister;

(e) Cousin; or

(f) In-law.

(b) Its sale would cause undue hardship, due to loss of housing for co-owner of the property and the co-owner provides a signed statement that he or she:

(i) Uses the property as his or her principal place of residence; and

(ii) Would have to move if the property were sold; and

(iii) Has no other living quarter readily available.

(c) The individual leaves his or her home due to domestic abuse and has not established a new principal place of residence, or has not taken action to render the home no longer excludable.

(d) The property satifies the provisions governing the treatment of property essential for self-support described in rule 5160:1-3-05.19 of the Administrative Code.

Appellant's attorney argued that the home should be excluded because as of the date of the state hearing, the home had been for sale for almost a year and had failed to sell. The Attorney argued that the failure of the home sale showed Appellant did not have the legal ability to convert the home to cash.

The hearing decision found that the failure of the home to sell indicated that Appellant was legally unable to complete the sale of the home to convert it to cash.

Upon administrative appeal Appellant argued 42 USC 1382b(b) which provides:

*(b) Disposition of resources; grounds for exemption from disposition requirements.*
*(1) The Commissioner of Social Security shall prescribe the period or periods of time within which, and the manner in which, various kinds of property must be disposed of in order not to be included in determining an individual's eligibility for benefits. Any portion of the individual's benefits paid for any such period shall be conditioned upon such disposal; and any benefits so paid shall (at the time of the disposal) be considered overpayments to the extent they would not have been paid had the disposal occurred at the beginning of the period for which such benefits were paid.*
*(2) Notwithstanding the provisions of paragraph (1), the Commissioner of Social Security shall not require the disposition of any real property for so long as it cannot be sold because (A) it is jointly owned (and its sale would cause undue hardship, due to loss of housing, for the other owner or owners), (B) its sale is barred by a legal impediment, or (C) as determined under regulations issued by the Commissioner of Social Security, the owner's reasonable efforts to sell it have been unsuccessful.*

20 CFR 416.1245 provides:

*(a) Loss of housing for joint owner. Excess real property which would be a resource under § 416.1201 is not a countable resource for conditional benefit purposes when: it is jointly owned; and sale of the property by an individual would cause the other owner undue hardship due to loss of housing. Undue hardship would result when the property serves as the principal place of residence for one (or more) of the other owners, sale of the property would result in loss of that residence, and no other housing would be readily available for the displaced other owner (e.g., the other owner does not own another house that is legally available for occupancy). However, if undue hardship ceases to exist, its value will be included in countable resources as described in § 416.1207.*
*(b) Reasonable efforts to sell.*
*(1) Excess real property is not included in countable resources for so long as the individual's reasonable efforts to sell it have been unsuccessful. The basis for determining*

*whether efforts to sell are reasonable, as well as unsuccessful, will be a 9-month disposal period described in § 416.1242. If it is determined that reasonable efforts to sell have been unsuccessful, further SSI payments will not be conditioned on the disposition of the property and only the benefits paid during the 9-month disposal period will be subject to recovery. In order to be eligible for payments after the conditional benefits period, the individual must continue to make reasonable efforts to sell.*

*(2) A conditional benefits period involving excess real property begins as described at § 416.1242(a). The conditional benefits period ends at the earliest of the following times:*

*(i) Sale of the property;*

*(ii) Lack of continued reasonable efforts to sell;*

*(iii) The individual's written request for cancellation of the agreement;*

*(iv) Countable resources, even without the conditional exclusion, fall below the applicable limit (e.g., liquid resources have been depleted); or*

*(v) The 9-month disposal period has expired.*

*(3) Reasonable efforts to sell property consist of taking all necessary steps to sell it in the geographic area covered by the media serving the area in which the property is located, unless the individual has good cause for not taking these steps. More specifically, making a reasonable effort to sell means that:*

*(i) Except for gaps of no more than 1 week, an individual must attempt to sell the property by listing it with a real estate agent or by undertaking to sell it himself;*

*(ii) Within 30 days of receiving notice that we have accepted the individual's signed written agreement to dispose of the property, and absent good cause for not doing so, the individual must:*

*(A) List the property with an agent; or*

*(B) Begin to advertise it in at least one of the appropriate local media, place a "For Sale" sign on the property (if permitted), begin to conduct "open houses" or otherwise show the property to interested parties on a continuous basis, and attempt any other appropriate methods of sale; and*

*(iii) The individual accepts any reasonable offer to buy and has the burden of demonstrating that an offer was rejected because it was not reasonable. If the individual receives an offer that is at least two-thirds of the latest estimate of current market value, the individual must present evidence to establish that the offer was unreasonable and was rejected.*

*(4) An individual will be found to have "good cause" for failing to make reasonable efforts to sell under paragraph (b)(3) of this section if he or she was prevented by circumstances beyond his or her control from taking the steps specified in paragraph (b)(3) (i) through (ii) of this section.*

*(5) An individual who has received conditional benefits through the expiration of the 9 month disposal period and whose benefits have been suspended as described at § 416.1320 for reasons unrelated to the property excluded under the conditional benefits*

*agreement, but whose eligibility has not been terminated as defined at §§ 416.1331 through 416.1335, can continue to have the excess real property not included in countable resources upon reinstatement of SSI payments if reasonable efforts to sell the property resume within 1 week of reinstatement. Such an individual will not have to go through a subsequent conditional benefits period. However, the individual whose eligibility has been terminated as defined at §§ 416.1331 through 416.1335 and who subsequently reapplies would be subject to a new conditional benefits period if there is still excess real property.*

Appellant also attaches Medicaid State Plan documents to his administrative appeal request arguing that Ohio is a 1634 state and must adopt Social Security standards or less restrictive standards and that therefore the above language prevents the resource of the home from being counted against the Appellant.

20 CFR 416.1201 provides:

*(a) Resources; defined. For purposes of this subpart L, resources means cash or other liquid assets or any real or personal property that an individual (or spouse, if any) owns and could convert to cash to be used for his or her support and maintenance.*
*(1) If the individual has the right, authority or power to liquidate the property or his or her share of the property, it is considered a resource. If a property right cannot be liquidated, the property will not be considered a resource of the individual (or spouse).*
*(2) Support and maintenance assistance not counted as income under § 416.1157(c) will not be considered a resource.*
*(3) Except for cash reimbursement of medical or social services expenses already paid for by the individual, cash received for medical or social services that is not income under § 416.1103(a) or (b), or a retroactive cash payment which is income that is excluded from deeming under § 416.1161(a)(16), is not a resource for the calendar month following the month of its receipt. However, cash retained until the first moment of the second calendar month following its receipt is a resource at that time.*
*(i) For purposes of this provision, a retroactive cash payment is one that is paid after the month in which it was due.*
*(ii) This provision applies only to the unspent portion of those cash payments identified in this paragraph (a)(3). Once the cash from such payments is spent, this provision does not apply to items purchased with the money, even if the period described above has not expired.*
*(iii) Unspent money from those cash payments identified in this paragraph (a)(3) must be identifiable from other resources for this provision to apply. The money may be commingled with other funds, but if this is done in such a fashion that an amount from such payments can no longer be separately identified, that amount will count toward the resource limit described in § 416.1205.*



*(4) Death benefits, including gifts and inheritances, received by an individual, to the extent that they are not income in accordance with paragraphs (e) and (g) of § 416.1121 because they are to be spent on costs resulting from the last illness and burial of the deceased, are not resources for the calendar month following the month of receipt. However, such death benefits retained until the first moment of the second calendar month following their receipt are resources at that time.*

*(b) Liquid resources. Liquid resources are cash or other property which can be converted to cash within 20 days, excluding certain nonwork days as explained in § 416.120(d). Examples of resources that are ordinarily liquid are stocks, bonds, mutual fund shares, promissory notes, mortgages, life insurance policies, financial institution accounts (including savings, checking, and time deposits, also known as certificates of deposit) and similar items. Liquid resources, other than cash, are evaluated according to the individual's equity in the resources. (See § 416.1208 for the treatment of funds held in individual and joint financial institution accounts.)*

*(c) Nonliquid resources.*

*(1) Nonliquid resources are property which is not cash and which cannot be converted to cash within 20 days excluding certain nonwork days as explained in § 416.120(d). Examples of resources that are ordinarily nonliquid are loan agreements, household goods, automobiles, trucks, tractors, boats, machinery, livestock, buildings and land. Nonliquid resources are evaluated according to their equity value except as otherwise provided. (See § 416.1218 for treatment of automobiles.)*

*(2) For purposes of this subpart L, the equity value of an item is defined as:*

*(i) The price that item can reasonably be expected to sell for on the open market in the particular geographic area involved; minus*

*(ii) Any encumbrances.*

A recent court decision from the Ohio 11th Court of Appeals, *Lola Underwood c/o Ellen E. Savage as Executrix of the Estate of Lola Underwood v. Ohio Department of Job and Family Services*, Case No. 2019-Ohio-4924 (2019), stated in part that:

*[\*P20] Section 416.1201(a) defines resources as "cash or other liquid assets or any real or personal property that an individual \* \* \* owns and could convert to cash to be used for his or her support or maintenance." Part 416.1201(c) defines nonliquid resources, which are excluded from the section 416.1201(a) definition of resources, as, inter alia, "property \* \* \* which cannot be converted to cash within 20 days" and provides examples including buildings and land. Ms. Underwood argues her home could not be converted to cash within 20 days because she did not have a willing buyer, and thus could not be considered an available resource which counted toward the Medicaid resource limit.*

*[\*P21] The trial court found appellant's reliance on 20 CFR 416.1201 misplaced. We agree. Part 416 relates to the provisions of Title XVI (Supplemental Security Income For*

*The Aged, Blind, and Disabled) of the Social Security Act as amended, which "established a national [\*\*9] program \* \* \* for the purposes of providing supplemental security income to individuals who have attained age 65 or are blind or disabled." 20 CFR 416.101. As discussed above, Medicaid was created under Title XIX, not Title XVI. Certain provisions of 20 CFR 416, however, are utilized in some Medicaid eligibility determinations.*

*[\*P22] States opting to participate in the Medicaid program can choose one of three options: SSI criteria, 209(b), and 1634. Eligibility is determined differently under each option. See, generally, Social Security Administration Program Operations Manual System (https://secure.ssa.gov/apps10/poms.nsf/lnx/0501715010). The "1634 states", including Ohio as of August 1, 2016, allow the SSA to make Medicaid eligibility determinations for SSI recipients. 42 U.S.C. 1383c. In such states, if the SSA determines that an individual is eligible for SSI, that individual is automatically enrolled in Medicaid without further verification required.*

*[\*P23] Some of those eligibility requirements are found in Subpart U of Part 416, the only subpart which expressly contains provisions regarding Medicaid. 20 CFR 416.101(u) ("Subpart U of this part contains provisions with respect to agreements with States for Federal determination of Medicaid eligibility [\*\*10] of applicants for supplemental security income."). Indeed, [t]he comprehensive regulations on eligibility for the Medicaid program, administered by the Health Care Financing Administration, are in part 435 of title 42 of the Code of Federal Regulations." 20 CFR 416.2101(b). Thus, excepting Subpart U, unless 20 CFR 416, or a part thereof, is incorporated into the Medicaid rules or statutes, it is inapplicable to Medicaid matters.*

*[\*P24] Ms. Underwood argues that "it is not logical that the federal regulations would define 'resources' differently for SSI eligibility and Medicaid eligibility when some states provide for Medicaid eligibility based on SSI eligibility." We disagree.*

*[\*P25] A state is not required to establish a Medicaid program, but should it do so the program must conform to federal requirements. 42 U.S.C. 1396a; Schweiker, supra. The Social Security Act does not require that the SSA determine Medicaid eligibility for all SSI recipients and allows for stricter eligibility requirements, such as in "209(b) states," provided they allow individuals to "spenddown" to the income eligibility level. See 42 U.S.C. 1396a(f) and Social Security Administration Program Operations Manual System (https://secure.ssa.gov/apps10/poms.nsf/lnx/0501715010). Indeed, prior to August [\*\*11] 1, 2016, Ohio was a 209(b) state and implemented stricter criteria than the SSI program.*

*[\*P26] Moreover, in 1634 states, though the SSA determines Medicaid eligibility for those individuals who are eligible for SSI, it is the state that issues Medicaid denial notices and solely determines Medicaid ineligibility. 20 CFR 416.2116 and Social Security Administration Program Operations Manual System (https://secure.ssa.gov/apps10/poms.nsf/lnx/0501715010). In the case at bar, however, the record is devoid of any reference to whether Ms. Underwood was eligible for the SSI program; instead, she applied for long-term care Medicaid benefits, which is subject to*



*additional eligibility rules. See Ohio Adm.Code 5160:1-6, et seq.*

*[\*P27] Nevertheless, Ms. Underwood argues that "regulations relating to Title XIX are contained in chapter IV, Title 42, and subtitle A, Title 45, Code of Federal Regulations" and that "[o]ne of those regulations is 42 USC 1382b, which pertains to the treatment of resources for purposes of Medicaid eligibility. 42 USC 1382b <u>specifically cites</u> 20 CFR 416 as an authority." (Emphasis original.)*

*[\*P28] Ms. Underwood makes several errors in this analysis. As noted above, 42 USC 1382b is contained in Subchapter XVI. Supplemental Security Income for Aged, Blind, and Disabled. In [\*\*12] the United States Code, the federal Medicaid program provisions are located under 42 USC 1396 et seq. Inherently, 42 USC 1382b is not a Medicaid provision. However, it is specifically incorporated by reference into 42 USC 1396p, a Medicaid provision. In fact, 42 USC 1382b contains the definition of resources for Medicaid eligibility under the federal scheme. However, 42 USC 1382b does not cite or reference to 20 CFR 416. To the contrary, 20 CFR 416.1201 cites 42 USC 1382b as one of its authorities. Thus, 20 CFR 416.1201 is not a Medicaid rule and is not incorporated into the Medicaid statutory framework.*

*[\*P29] Ohio courts have not often had opportunity to consider this issue. However, the Eighth District recently rejected the application of 20 CFR 416.1201 to Ohio Medicaid eligibility in Communicare v. Ohio Dept. of Job and Family Services, 8th Dist. Cuyahoga No. 106874, 2019-Ohio-3757, ¶14. We agree and find the trial court here did not abuse its discretion in finding 20 CFR 416.1201 inapplicable to determining Ohio Medicaid eligibility.*

Ohio Admin. Code 5160:1-3-05.13 provides essentially that if the individual does not intend to return to the home then the home is a countable resource. Appellant argues it is incorrect to count the home as it has been on the market for over a year and has failed to sell. Appellant's counsel in the administrative appeal cited federal code and regulation sections which suggest that reasonable efforts to sell are sufficient to exclude the home as a resource.

As the *Underwood* case points out, these sections do not apply to Medicaid as Appellant argues. We find the argument in *Underwood* persuasive and affirm the state hearing decision. The home is a countable resource.

## **<u>DECISION</u>**

The state hearing decision is AFFIRMED.

David Robertson
Administrative Appeal Officer

Mariella Perrotta
Concur

Lewis George
Chief Legal Counsel
02/14/2020

### Notice to Appellant

This administrative appeal decision is the final decision on this appeal from the Ohio Department of Job and Family Services and/or the Ohio Department of Medicaid. It is binding on the Departments and agency, unless it is reversed or modified on appeal to the court of common pleas.

If you disagree with the decision, you may appeal it to the court of common pleas pursuant to sections 119.12, 5101.35(E), and 5160.31 of the Revised Code. Mail the original notice of appeal to the department at the following address:

Ohio Department of Job and Family Services
Office of Legal and Acquisition Services
30 E. Broad Street, 31st Floor
Columbus, Ohio 43215-3414

You must also file a copy of the notice of appeal with the court of common pleas in the county in which you reside (Franklin County, if you do not reside in Ohio). Your appeal must be filed within thirty (30) days of the date the decision was mailed to you.

Please note: Any additional information received by the Bureau of State Hearings, relating to this matter, shall be returned to the person who sent it.

If you have questions about appealing to a court, contact your attorney, local Legal Aid Society, or bar association. If you don't know how to reach your local Legal Aid office, call 1-866-LAW-OHIO (1-866-529-6446), toll free, or search the Legal Aid directory at http://www.ohiolegalservices.org/ programs.



This decision was sent to the following:

MATTHEW BARNES
HAMILTON CDJFS
DIANNA G GARDNER

This page intentionally left blank.

# Exhibit B



## RESIDENTIAL LISTING WORKSHEET
### EXCLUSIVE RIGHT TO SELL LISTING AGREEMENT



## PROPERTY INFO

LIST DATE: _____ EXPIRATION DATE: _____ LIST PRICE $ 79,000.00 ML # _____

ST # 145 DIR PREFIX -- STREET NAME Frost Ln

DIR SUFFIX -- ST TYPE Ln UNIT # -- ZIP CODE 25515 ZIP+4 _____ STATE WV

AREA 360 CITY Gallipolis Ferry COUNTY Mason

ELEMENTARY SCHOOL Beale Elementary JR MIDDLE SCHOOL Point Pleasant Jr/Sr High

SENIOR HIGH SCHOOL Point Pleasant Jr/Sr High

LOT FRONT _____ BACK _____ LEFT _____ RIGHT _____ or ACRES 0.42

TAX ID 02-340A-0028-0000-0000 YEAR BUILT 1971 ANNUAL TAXES $387.00

FRANCHISE OPT-IN ☐ Y ☒ N

## AGENT INFO

LISTING AGENT Angela Zimmerman PHONE (304)857-8312

OFFICE Exclusive Realty OFFICE # 1918 PHONE (304)345-3030

CO-LIST AGENT NAME Jade Schultz CO-LIST PHONE (304)812-6009

## ADDITIONAL INFO

OWNER NAME Dianna Gardner (Kelly Strunk ) OWNER PHONE ████████

DEED 388 PG 594 LEGAL 0.19 ACRE BEALE LAND MODULAR (&) 0.23 ACRE BEALE LAND

SUBDIVISION NOne HOME ASSOC ☐ Y ☒ N If Yes ANNUAL FEE HOA $ _____

CO-BROKERAGE SPLIT 3% BUYERS AGENT ☒ Y ☐ N EXCLUSIVE AGENCY ☐ Y ☐ N SUB-AGENCY ☐ Y ☐ N

LOCKBOX # 0 23 HOUR LISTING ☐ Y ☒ N

INTERNET ☒ Y ☐ N (Display Listing on Websites like Realtor.com) IDX ☒ Y ☐ N (Display Listing on other IDX Participant Web Pages)

VIRTUAL TOUR URL _____

DIRECTIONS _____

REMARKS _____

CONFIDENTIAL REMARKS RE Taxes are with Homestead Exemption - Parcels 27 and 28 on Tax Map

SELLER(S) ACKNOWLEDGE THIS IS PAGE 1 OF 4 PAGES _DGC_ (INITIALS) _____ (INITIALS)

FORM 113 REV. 08-17

EXCLUSIVE REALTY, LLC, 506 Main St. Point Pleasant WV 25550
Phone:(304)857-8312     Fax:     Angela Zimmerman

Copyright Kanawha Valley Board of REALTORS®

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

145 Frost Ln



**KANAWHA VALLEY BOARD OF REALTORS®**
**LISTING CHANGE FORM**

THIS DATA LOADED
ON COMPUTER BY

(Initial here only if your
Office loaded the data)

**(The Items in RED with * require the Sellers Signature)**
**(R) Required Information**

Listing Office(R) Exclusive Realty _____ Listing Salesperson(R) Angela Zimmerman _____

ML#(R) 227326 _____ Property Address(R) 145  Frost Ln _____ Gallipolis Ferry _____

WV  25515 _____ Is this request a: _____ Back on Market* __X__ Extension* _____ Price Change*

_____ Withdrawal* _____ Activate Listing on MLS

Please specify change requested on form below

MLS Activation Date December 9, 2018 _____

Expiration Date (New) September 30, 2019 _____ Price change to $59,000.00 _____

Legal Description 0.19 ACRE BEALE LAND MODULAR (&) 0.23 ACRE BEALE LAND _____

Salesperson Name _____

Taxes _____ Sellers Name Dianna G. Gardner _____

Square Feet:   Total _____ Upper _____ Main _____ Lower _____

Room Sizes:   RM _____ x _____ RM _____ x _____ RM _____ x _____

Area _____ Age _____

For changes to other Items not listed above please specify below:

_____
_____
_____
_____
_____

Exclusive Realty
Firm Name                                Date

*Dianna Gardner*                06/11/2019 09:04 PM EDT
Seller  Dianna G. Gardner                Date

*Angela Zimmerman*        06/11/2019 08:24 PM EDT
Salesperson Name                         Date
Angela Zimmerman

Seller                                   Date

**\*(Sellers Signatures Required)**

FORM 116 REV 7-17

EXCLUSIVE REALTY, LLC, 506 Main St. Point Pleasant WV 25550
Phone: (304)857-8312         Fax: 8667459433         Angela Zimmerman

Copyright © Kanawha Valley Board of REALTORS®

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

145 Frost Ln

To: Matt Barnes    Page 2 of 3    2019-10-08 18:50:47 (GMT)    18667459433 From: Angela Zimmerman

10/8/2019                                                        Gmail - (no subject)

 Gmail                                          Angela Zimmerman <angiezim2009@gmail.com>

_____

**(no subject)**

_____

**Angela Zimmerman** <angiezim2009@gmail.com>                    Tue, Oct 8, 2019 at 12:40 PM
Draft

To Whom it May Concern:

Dianna G. Gardner entered into an Exclusive Right to Sell Agreement for the property
located at 145 Frost Ln, Gallipolis Ferry, WV 25515 last December.

Attached is a timeline from the MLS (Multiple Listing Service) of key dates/prices. The
home was initially listed on 12/9/18 at $79,000.

An offer was received but the buyer was unable to get financing due to this property
being a Double-Wide that has had additions added onto it. It creates major issues with
lending. The contract was canceled and the property went back on the market with
subsequent price drops.

Another offer was received and it went under contract 8/29/19 but has yet to close as
there are multiple challenges with the home and very little financing in the financial
world that will lend on this. The home did not have tie-down straps as required, so
those were installed. The appraisal has been done by the buyer and the loan is in
underwriting and we are in waiting mode. The price accepted was significantly less and
with a large amount of seller concessions for needed repairs, closing costs, etc. We are
hopeful this will work for this buyer....if it does not, we are going to need a cash buyer
on this property and the price will need to be lowered again. It is all about the lending
and it's tough on a home of this age and then the original Manufactured Home has been
modified.

I hope this helps. Please let me know if there is anything else that you need at this time.

Angie

--
**Angie (Cline) Zimmerman, BROKER**
**Direct Cell: 304-857-8312**

The Angie Zimmerman Realty Group
Angie Zimmerman Broker/Owner
506 Main St
Pt. Pleasant, WV 25550
304-857-8312

_____

 **Timeline.pdf**
16K

# Exhibit C

Revision: HCFA-PM-91-4    (BPD)
AUGUST 1991

Attachment 2.2-A
Page 6
OBM No. 0938-

State: <u>Ohio</u>

| Agency* | Citation(s) | Groups Covered |
|---|---|---|

A.  <u>Mandatory Coverage – Categorically Needy and Other Required Special Groups</u> (Continued)

42 CFR 435.120    13.  Aged, Blind and Disabled individuals Receiving Cash Assistance

    ☒  a.  Individuals receiving SSI

This includes beneficiaries' eligible spouses and persons receiving SSI benefits pending a final determination of blindness or disability or pending disposal of excess resources under an agreement with the Social Security Administration; and beginning January 1, 1981 persons receiving SSI under section 1619(a) of the Act or considered to be receiving SSI under section 1619(b) of the Act.

| | |
|---|---|
| <u>  X  </u> | Aged |
| <u>  X  </u> | Blind |
| <u>  X  </u> | Disabled |

*Agency that determines eligibility for coverage.

TN: <u>15-015</u>
Supersedes
TN: <u>91-25</u>

Approval Date: <u>  7/13/16  </u>

Effective Date: <u>08/01/2016</u>

Revision: HCFA-PM-91-4 (BPD)
AUGUST 1991

Attachment 2.2-A
Page 9c
OMB No.: 0938-

State: <u>Ohio</u>

| Agency* | Citation(s) | Groups Covered |
|---|---|---|

B.   <u>Optional Groups Other Than the Medically Needy</u> (Continued)

42 CFR 435.210,
1902(a)(10)(A)(ii)
and 1905(a) of
the Act

☒   1.   Individuals described below who meet the income and resource requirements of AFDC, SSI, or an optional State supplement as specified in 42 CFR 435.230, but who do not receive cash assistance.

☐   The plan covers all individuals as described above.

☒   The plan covers only the following group or groups of individuals:

__X__ Aged
__X__ Blind
__X__ Disabled

42 CFR 435.211   ☒   2.   Individuals who would be eligible for AFDC, SSI, or an optional State supplement as specified in 42 CFR 435.230, if they were not in a medical institution.

*Agency that determines eligibility for coverage.

TN: <u>15-015</u>
Supersedes
TN: <u>91-26</u>

Approval Date: __7/13/16__

Effective Date: <u>08/01/2016</u>
HCFA ID: 7983E

vision: HCFA-PM-91-4    (BPD)                ATTACHMENT 2.2-A
        AUGUST 1991                          Page 19
                                             OMB No.: 0938-

            State: _____Ohio_____

---

Agency*    Citation(s)                Groups Covered

---

                    B.  Optional Groups Other Than the Medically Needy
                        (Continued)

42 CFR 435.231 /X/      12.  Individuals who are in institutions for at
1902(a)(10)                  least 30 consecutive days and who are
(A)(ii)(V)                   eligible under a special income level.
of the Act                   Eligibility begins on the first day of
                             the 30-day period.  These individuals
                             meet the income standards specified in
                             Supplement 1 to ATTACHMENT 2.6-A.

               /X/           The State covers all individuals as described
                             above.

               /_/           The State covers only the following group or
                             groups of individuals:

1902(a)(10)(A)          ____  Aged
(ii) and 1905(a)        ____  Blind
of the Act              ____  Disabled
                        ____  Individuals under the age of--
                              ____  21
                              ____  20
                              ____  19
                              ____  18
                        ____  Caretaker relatives
                        ____  Pregnant women

---

TN No. 91-24
Supersedes              Approval Date  2-12-92        Effective Date  10-1-91
TN No.  87-43
                                                     HCFA ID:  7983E

Revision: HCFA-PM-91-4    (BPD)
    AUGUST 1991

Attachment 2.6-A
Page 16a
OBM No. 0938-

State: _____ Ohio _____

| Citation | Condition or Requirement |
|---|---|

    5. <u>Methods for Determining Resources</u>

1902(a)(10)(A),
1902(a)(10)(C),
1902(m)(1)(B)
and (C), and
1902(r) of the Act

b. <u>Aged individuals</u>. For aged individuals covered under section 1902(a)(10)(A)(ii)(X) of the Act, the agency uses the following methods for treatment of resources:

_____ The methods of the SSI program.

__X__ SSI methods and/or any more liberal methods described in <u>Supplement 8c to Attachment 2.6-A</u>.

_____ Methods that are more restrictive (except for individuals described in section 1902(m)(1) of the Act) and/or more liberal than those of the SSI program. <u>Supplement 5 to Attachment 2.6-A</u> describes the more restrictive methods and <u>supplement 8b to Attachment 2.6-A</u> specifies the more liberal methods.

TN: <u>15-015</u>
Supersedes
TN: <u>91-27</u>

Approval Date: __7/13/16__

Effective Date: <u>08/01/2016</u>
HCFA ID: 7985E

Revision: HCFA-PM-91-4 (BPD)
AUGUST 1991

Attachment 2.6-A
Page 17
OBM No. 0938-

State: _____ Ohio _____

| Citation | | Condition or Requirement |
|---|---|---|

In determining relative financial responsibility, the agency considers only the resources of spouses living in the same household as available to spouses.

1902(a)(10)(A),
1902(a)(10)(C),
1902(m)(1)(B), and
1902(r) of the Act

c.   Blind individuals.  For blind individuals, the agency uses the following methods for treatment of resources:

_____   The methods of the SSI program.

__X__   SSI methods and/or any more liberal methods described in Supplements 8b and 8c to Attachment 2.6-A.

_____   Methods that are more restrictive and/or more liberal than those of the SSI program.  Supplement 5 to Attachment 2.6-A describes the more restrictive methods and Supplement 8b to Attachment 2.6-A specifies the more liberal methods.

In determining relative financial responsibility, the agency considers only the resources of spouses living in the same household as available to spouses and the resources of parents as available to children living with parents until the children become 21.

TN: 15-015
Supersedes
TN: 91-27

Approval Date:   7/13/16

Effective Date: 08/01/2016
HCFA ID:  7985E

Revision: HCFA-PM-91-4     (BPD)
AUGUST 1991

Attachment 2.6-A
Page 18
OBM No. 0938-

State: _____ Ohio _____

| Citation | Condition or Requirement |
|---|---|

1902(a)(10)(A),
1902(a)(10)(C),
1902(m)(1)(B) and
(C), and 1902(r)(2)
of the Act

d.    <u>Disabled individuals, including individuals covered under section 1902(a)(10)(A)(ii)(X) of the Act</u>. The agency uses the following methods for the treatment of resources:

   \_\_\_\_\_    The methods of the SSI program.

    X    SSI methods and/or any more liberal methods described in <u>Supplements 8b and 8c to Attachment 2.6-A</u>.

   \_\_\_\_\_    Methods that are more restrictive (except for individuals described in section 1902(m)(1) of the Act) and/or more liberal than those under the SSI program. More restrictive methods are described in <u>Supplement 5 to Attachment 2.6-A</u> and more liberal methods are specified in <u>Supplement 8b to Attachment 2.6-A</u>.

In determining relative financial responsibility, the agency considers only the resources of spouses living in the same household as available to spouses and the resources of parents as available to children living with parents until the children become 21.

TN: <u>15-015</u>
Supersedes
TN: <u>91-27</u>

Approval Date:  <u>7/13/16</u>

Effective Date: <u>08/01/2016</u>
HCFA ID: 7985E

# Exhibit D

**Table 2. Percent Holding Assets for Households, by Type of Asset Owned and Selected Characteristics: 2016**

| Characteristic | Assets at Financial Institutions | | | | Stocks and Mutual Fund Shares | Equity in Business or Profession | Equity in Own Home | Equity in Motor Vehicles | Rental Property Equity | Other Real Estate Equity | Retirement accounts | | | Educational Savings Accounts | Annuities and Trusts | Cash Value Life Insurance | Other Assets |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Interest Earning | Regular Checking Accounts | Other Interest Earning Assets | | | | | | | Total | IRA or KEOGH Accounts | 401k & Thrift Savings Plan | | | | |
| **Total** | 91.7 | 74.7 | 68.9 | 8.5 | 18.9 | 15.0 | 63.0 | 83.4 | 7.4 | 7.9 | 53.7 | 29.6 | 42.4 | 4.5 | 4.9 | 20.7 | 3.0 |
| **Race and Hispanic Origin of Householder** | | | | | | | | | | | | | | | | | |
| White alone | 93.4 | 76.8 | 68.7 | 9.3 | 20.8 | 16.0 | 67.6 | 86.0 | 7.8 | 8.6 | 56.6 | 32.4 | 43.9 | 4.9 | 5.8 | 20.8 | 3.4 |
| White alone, not Hispanic | 94.9 | 79.6 | 68.0 | 10.4 | 23.5 | 16.2 | 71.0 | 87.3 | 8.3 | 9.5 | 60.4 | 36.2 | 46.2 | 5.5 | 6.6 | 22.6 | 3.8 |
| Black alone | 80.8 | 61.8 | 66.9 | 4.3 | 6.5 | 8.6 | 42.2 | 70.5 | 4.0 | 4.2 | 37.3 | 14.3 | 32.7 | 1.5 | 1.1 | 21.9 | 1.3 |
| Asian alone | 97.6 | 80.3 | 77.1 | 7.0 | 28.1 | 16.9 | 57.5 | 79.8 | 11.6 | 6.4 | 59.2 | 33.4 | 48.3 | 7.2 | 3.1 | 17.9 | 2.4 |
| Other (residual) | 86.2 | 67.1 | 70.3 | 6.5 | 9.7 | 14.5 | 43.5 | 78.1 | 6.3 | 6.4 | 40.6 | 16.7 | 35.0 | 2.1 | 1.8 | 16.4 | 2.1 |
| Hispanic origin (any race) | 84.7 | 62.5 | 72.4 | 3.1 | 5.9 | 14.4 | 47.7 | 78.6 | 5.4 | 3.7 | 36.1 | 11.9 | 31.8 | 2.0 | 1.2 | 11.2 | 1.3 |
| Not of Hispanic origin | 92.8 | 76.6 | 68.4 | 9.3 | 21.0 | 15.1 | 65.4 | 84.2 | 7.8 | 8.5 | 56.5 | 32.4 | 44.0 | 4.9 | 5.5 | 22.1 | 3.3 |
| **Nativity of Household Members** | | | | | | | | | | | | | | | | | |
| At least one foreign-born household member | 90.6 | 71.0 | 75.2 | 5.8 | 16.0 | 18.7 | 57.5 | 80.2 | 8.1 | 5.2 | 47.2 | 22.4 | 39.9 | 4.7 | 2.1 | 14.0 | 2.0 |
| Native | 92.0 | 75.7 | 67.3 | 9.1 | 19.7 | 14.1 | 64.4 | 84.2 | 7.3 | 8.5 | 55.4 | 31.4 | 43.0 | 4.4 | 5.6 | 22.4 | 3.3 |
| **Age of Householder** | | | | | | | | | | | | | | | | | |
| Less than 35 years | 89.3 | 73.0 | 71.5 | 4.9 | 11.2 | 10.7 | 35.0 | 78.2 | 2.9 | 2.4 | 48.0 | 17.5 | 43.2 | 3.1 | 0.7 | 11.7 | 1.4 |
| 35 to 44 years | 90.6 | 75.4 | 72.3 | 7.1 | 18.0 | 17.0 | 57.9 | 85.8 | 7.5 | 5.0 | 58.7 | 27.5 | 52.7 | 8.2 | 1.3 | 18.0 | 2.0 |
| 45 to 54 years | 90.9 | 74.9 | 71.2 | 8.3 | 18.9 | 18.0 | 67.7 | 86.6 | 8.0 | 7.7 | 61.7 | 30.3 | 54.5 | 8.3 | 3.0 | 19.7 | 3.6 |
| 55 to 64 years | 92.3 | 74.8 | 67.1 | 9.8 | 21.6 | 19.3 | 73.4 | 85.7 | 8.6 | 12.0 | 58.7 | 35.1 | 47.3 | 3.1 | 7.0 | 23.4 | 3.5 |
| 65 years and over | 94.5 | 75.5 | 64.4 | 11.2 | 23.6 | 11.4 | 76.9 | 82.1 | 9.8 | 11.0 | 44.9 | 35.6 | 21.8 | 1.3 | 10.4 | 28.0 | 4.1 |
| 65 to 69 years | 95.8 | 78.9 | 67.6 | 10.5 | 23.6 | 16.9 | 76.8 | 87.1 | 11.1 | 13.3 | 53.8 | 39.9 | 33.8 | 1.9 | 9.6 | 27.4 | 5.0 |
| 70 to 74 years | 93.7 | 73.7 | 65.9 | 11.3 | 24.7 | 12.5 | 79.2 | 86.3 | 9.0 | 12.6 | 47.3 | 38.2 | 23.2 | 2.2 | 9.5 | 30.0 | 4.1 |
| 75 and over | 94.0 | 73.9 | 61.1 | 11.6 | 22.9 | 6.7 | 75.7 | 76.1 | 8.8 | 8.3 | 36.9 | 31.1 | 12.3 | 0.5 | 11.5 | 27.4 | 3.5 |
| **Age Composition of the Household** | | | | | | | | | | | | | | | | | |
| No children under 18 | 92.2 | 74.6 | 67.2 | 8.6 | 19.9 | 13.8 | 64.0 | 81.9 | 7.4 | 8.5 | 52.0 | 31.1 | 38.1 | 1.8 | 6.4 | 21.7 | 3.3 |
| One or more children under 18 | 90.6 | 75.0 | 72.7 | 8.0 | 16.8 | 17.6 | 60.8 | 86.7 | 7.6 | 6.4 | 57.3 | 26.3 | 51.5 | 10.4 | 1.7 | 18.3 | 2.3 |
| Youngest child under 5 | 89.7 | 73.7 | 71.6 | 6.5 | 16.8 | 15.3 | 54.8 | 86.6 | 7.5 | 5.0 | 56.2 | 25.0 | 50.6 | 8.7 | 1.0 | 16.2 | 2.0 |
| Youngest child 5 to 9 | 89.6 | 72.9 | 73.5 | 8.1 | 14.9 | 19.1 | 60.1 | 85.1 | 7.0 | 6.2 | 53.9 | 22.9 | 49.3 | 9.3 | 1.7 | 18.4 | 1.7 |
| Youngest child 10 to 18 | 92.3 | 78.2 | 73.4 | 9.6 | 18.2 | 19.1 | 68.2 | 88.0 | 8.2 | 8.1 | 61.1 | 30.3 | 54.3 | 13.1 | 2.4 | 20.7 | 3.1 |
| **Highest Level of Educational Attainment in the Household** | | | | | | | | | | | | | | | | | |
| No high school diploma | 70.5 | 36.8 | 56.7 | 1.0 | 0.8 | 8.7 | 40.3 | 56.8 | 2.5 | 1.1 | 10.7 | 4.1 | 7.4 | (D) | 1.3 | 9.5 | 0.7 |
| High school graduate only | 84.9 | 61.4 | 64.8 | 4.1 | 7.9 | 9.1 | 56.3 | 77.1 | 4.9 | 4.0 | 33.9 | 15.8 | 23.6 | 0.5 | 3.2 | 19.2 | 1.3 |
| Some college, no degree | 91.0 | 70.4 | 70.6 | 4.9 | 11.4 | 13.1 | 56.3 | 82.9 | 5.3 | 5.2 | 43.1 | 19.4 | 32.9 | 1.8 | 3.8 | 17.4 | 2.3 |
| Associate's degree | 94.2 | 77.2 | 73.7 | 7.5 | 13.9 | 12.8 | 65.3 | 87.3 | 6.4 | 6.8 | 56.3 | 25.4 | 46.0 | 3.1 | 4.0 | 21.0 | 2.2 |
| Bachelor's degree | 97.0 | 85.4 | 71.1 | 11.8 | 25.8 | 17.5 | 68.8 | 87.4 | 8.1 | 9.8 | 69.2 | 39.4 | 56.0 | 6.1 | 6.0 | 22.1 | 3.5 |
| Graduate or professional degree | 98.4 | 90.7 | 70.0 | 15.6 | 38.9 | 23.5 | 75.9 | 91.8 | 13.9 | 15.0 | 78.8 | 53.3 | 64.5 | 11.7 | 8.1 | 27.1 | 6.3 |
| **Single-Person Households** | | | | | | | | | | | | | | | | | |
| Total | 88.5 | 66.0 | 61.5 | 6.4 | 14.2 | 8.5 | 51.2 | 72.8 | 5.5 | 4.6 | 40.5 | 23.6 | 27.7 | 0.8 | 5.5 | 15.8 | 2.2 |
| Less than 35 years | 89.5 | 71.9 | 70.2 | 4.5 | 7.7 | 5.3 | 23.9 | 67.2 | 1.7 | 1.0 | 40.1 | 13.9 | 34.6 | 1.9 | 0.7 | 7.0 | 0.6 |
| 35 to 54 years | 84.4 | 61.7 | 61.7 | 3.0 | 13.0 | 12.5 | 45.6 | 74.3 | 5.4 | 2.1 | 49.2 | 23.2 | 40.4 | 0.5 | 1.9 | 15.3 | 1.9 |
| 55 to 64 years | 85.6 | 62.7 | 57.4 | 6.6 | 15.1 | 11.1 | 56.3 | 76.0 | 5.1 | 6.1 | 43.3 | 25.4 | 33.1 | 1.1 | 5.8 | 14.7 | 2.5 |
| 65 years and over | 92.3 | 67.7 | 59.3 | 9.2 | 17.7 | 6.0 | 65.2 | 72.8 | 7.5 | 7.1 | 33.6 | 27.5 | 13.3 | 0.4 | 10.0 | 21.1 | 2.9 |
| **Households of Any Size** | | | | | | | | | | | | | | | | | |
| Married-couple households | 95.7 | 83.2 | 71.5 | 11.4 | 25.9 | 20.4 | 79.0 | 92.4 | 10.4 | 11.8 | 66.9 | 38.9 | 54.3 | 7.5 | 5.6 | 25.9 | 4.2 |
| Less than 35 years | 93.9 | 80.2 | 73.3 | 6.2 | 16.5 | 16.1 | 57.8 | 91.9 | 4.8 | 4.3 | 64.8 | 27.5 | 58.9 | 5.9 | 0.7 | 16.3 | 2.1 |
| 35 to 54 years | 95.4 | 83.6 | 75.6 | 10.8 | 24.9 | 21.3 | 76.4 | 92.4 | 10.6 | 9.2 | 70.2 | 35.7 | 64.0 | 12.5 | 2.3 | 22.2 | 3.7 |
| 55 to 64 years | 96.1 | 84.0 | 68.7 | 12.7 | 27.8 | 25.5 | 87.3 | 92.9 | 11.7 | 17.2 | 70.8 | 44.1 | 58.3 | 4.2 | 8.4 | 29.8 | 4.8 |
| 65 years and over | 96.9 | 83.9 | 65.7 | 14.8 | 32.1 | 16.8 | 89.7 | 92.3 | 12.6 | 16.2 | 58.5 | 47.4 | 29.8 | 2.5 | 12.1 | 35.3 | 5.8 |
| Male householder | 88.4 | 66.4 | 64.7 | 5.2 | 13.7 | 12.5 | 47.6 | 77.9 | 4.8 | 4.2 | 42.2 | 21.3 | 31.8 | 1.2 | 3.4 | 14.8 | 2.7 |
| Less than 35 years | 90.7 | 69.9 | 70.9 | 4.1 | 11.9 | 9.2 | 26.5 | 74.7 | 2.0 | 0.9 | 41.9 | 14.2 | 36.5 | 1.1 | 1.2 | 9.3 | 1.7 |
| 35 to 54 years | 85.4 | 63.1 | 64.5 | 3.4 | 12.2 | 15.2 | 48.9 | 80.5 | 5.0 | 3.3 | 48.9 | 22.7 | 40.2 | 1.8 | 2.4 | 15.8 | 2.8 |
| 55 to 64 years | 86.7 | 62.2 | 60.9 | 6.4 | 15.6 | 16.1 | 57.3 | 78.5 | 5.7 | 7.4 | 42.6 | 25.3 | 29.5 | 1.2 | 4.3 | 14.0 | 3.1 |
| 65 years and over | 91.5 | 70.4 | 60.0 | 8.4 | 17.2 | 9.6 | 66.3 | 77.5 | 7.5 | 7.5 | 31.7 | 25.4 | 14.1 | 0.6 | 7.5 | 21.5 | 3.4 |
| Female householder | 87.8 | 67.1 | 67.7 | 6.0 | 11.5 | 8.1 | 48.5 | 73.0 | 4.6 | 4.2 | 40.8 | 20.6 | 30.9 | 2.0 | 4.8 | 16.4 | 1.4 |
| Less than 35 years | 82.9 | 68.0 | 70.2 | 4.2 | 4.7 | 6.2 | 18.1 | 66.6 | 1.8 | 1.7 | 35.4 | 9.9 | 32.3 | 1.7 | (D) | 9.0 | 0.3 |
| 35 to 54 years | 84.8 | 65.8 | 68.7 | 4.5 | 9.3 | 11.0 | 44.6 | 75.6 | 3.7 | 2.7 | 47.2 | 19.0 | 41.4 | 4.0 | 1.7 | 13.8 | 1.0 |
| 55 to 64 years | 89.0 | 65.6 | 68.5 | 6.4 | 13.6 | 9.3 | 57.2 | 76.5 | 4.6 | 4.9 | 46.4 | 24.6 | 38.5 | 2.2 | 6.1 | 17.7 | 1.3 |
| 65 years and over | 93.2 | 68.4 | 64.8 | 8.3 | 17.0 | 6.2 | 67.4 | 72.9 | 7.2 | 6.6 | 35.6 | 27.0 | 16.4 | 0.3 | 9.9 | 22.9 | 2.6 |
| **Labor Force Activity of Household Members Under 65** | | | | | | | | | | | | | | | | | |

**Table 2. Percent Holding Assets for Households, by Type of Asset Owned and Selected Characteristics: 2016**

| Characteristic | Assets at Financial Institutions | | | Other Interest Earning Assets | Stocks and Mutual Fund Shares | Equity in Business or Profession | Equity in Own Home | Equity in Motor Vehicles | Rental Property Equity | Other Real Estate Equity | Retirement accounts | | | Educational Savings Accounts | Annuities and Trusts | Cash Value Life Insurance | Other Assets |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Interest Earning | Regular Checking Accounts | | | | | | | | Total | IRA or KEOGH Accounts | 401K & Thrift Savings Plan | | | | |
| At least one household member with labor force activity during the year | 92.8 | 77.3 | 72.4 | 7.9 | 18.5 | 18.0 | 61.0 | 86.5 | 7.4 | 7.4 | 60.3 | 29.5 | 52.4 | 5.8 | 3.2 | 19.4 | 2.9 |
| At least one household member who worked full-time for the entire year | 95.0 | 81.4 | 73.7 | 8.1 | 19.9 | 16.5 | 65.3 | 66.0 | 7.8 | 8.1 | 67.6 | 32.0 | 60.1 | 6.7 | 3.0 | 21.2 | 3.0 |
| At least one household member who worked part-time during the year | 92.7 | 76.4 | 74.6 | 8.6 | 19.1 | 24.9 | 58.8 | 84.8 | 7.6 | 7.1 | 54.7 | 27.7 | 46.0 | 6.2 | 3.2 | 18.2 | 3.1 |
| At least one household member who was unemployed during the year | 87.7 | 68.9 | 73.3 | 7.0 | 12.8 | 12.1 | 49.8 | 81.3 | 5.7 | 5.6 | 45.1 | 20.5 | 38.9 | 3.4 | 2.2 | 15.1 | 2.7 |
| No labor force activity for any household member during the year | 75.9 | 51.6 | 55.2 | 6.3 | 11.0 | 2.1 | 50.9 | 62.7 | 3.4 | 4.8 | 21.2 | 15.3 | 12.2 | 1.3 | 5.0 | 16.0 | 1.7 |
| **Annual Household Income** | | | | | | | | | | | | | | | | | |
| Lowest quintile | 76.5 | 47.8 | 59.0 | 3.1 | 6.2 | 11.4 | 40.0 | 60.5 | 2.5 | 2.3 | 16.5 | 9.7 | 9.6 | 1.1 | 1.8 | 10.6 | 0.9 |
| Second quintile | 90.0 | 65.7 | 69.6 | 4.2 | 8.7 | 9.2 | 51.9 | 79.6 | 3.9 | 3.7 | 36.5 | 18.3 | 24.8 | 1.3 | 3.5 | 16.1 | 1.5 |
| Third quintile | 96.3 | 79.9 | 72.3 | 7.7 | 16.7 | 12.8 | 66.0 | 90.7 | 6.0 | 6.2 | 56.4 | 28.0 | 42.0 | 1.9 | 4.8 | 22.5 | 2.4 |
| Fourth quintile | 97.4 | 87.9 | 72.9 | 9.9 | 22.6 | 16.3 | 73.6 | 92.7 | 9.4 | 9.6 | 74.0 | 37.2 | 61.3 | 4.6 | 6.0 | 24.9 | 3.2 |
| Highest quintile | 98.5 | 92.3 | 70.8 | 17.3 | 40.5 | 25.3 | 83.7 | 93.6 | 15.5 | 17.4 | 85.2 | 54.8 | 74.3 | 13.6 | 8.4 | 29.1 | 7.0 |
| **Poverty Status** | | | | | | | | | | | | | | | | | |
| Household Income Below Poverty Threshold | 71.1 | 43.3 | 57.2 | 3.4 | 6.1 | 13.9 | 34.8 | 56.4 | 2.4 | 2.1 | 14.0 | 8.0 | 9.2 | 1.8 | 1.3 | 8.2 | 0.9 |
| Household Income Above Poverty Threshold | 94.3 | 78.6 | 70.4 | 9.1 | 20.5 | 15.1 | 66.6 | 86.8 | 8.1 | 8.6 | 58.7 | 32.3 | 46.5 | 4.8 | 5.3 | 22.2 | 3.3 |
| **Household Net Worth** | | | | | | | | | | | | | | | | | |
| Negative or zero | 75.1 | 52.5 | 63.7 | 2.2 | 4.1 | 8.6 | 17.9 | 63.8 | 1.4 | 1.6 | 26.9 | 7.1 | 23.8 | 1.2 | 0.2 | 7.1 | 0.9 |
| $1 to $4,999 | 85.6 | 46.6 | 71.7 | 1.2 | 1.0 | 6.7 | 8.7 | 58.7 | 0.1 | 0.1 | 10.5 | 2.0 | 9.4 | 0.2 | (D) | 4.3 | 0.2 |
| $5,000 to $9,999 | 88.4 | 65.8 | 74.1 | 3.4 | 3.6 | 8.3 | 20.5 | 89.1 | 0.5 | 0.5 | 22.3 | 4.0 | 20.6 | 1.2 | 0.8 | 9.7 | 0.5 |
| $10,000 to $24,999 | 90.1 | 68.3 | 73.4 | 2.7 | 5.1 | 11.7 | 40.5 | 84.4 | 1.2 | 0.4 | 38.2 | 11.5 | 31.8 | 1.1 | (D) | 15.4 | 1.0 |
| $25,000 to $49,999 | 94.8 | 74.2 | 75.0 | 2.7 | 6.7 | 11.7 | 61.2 | 88.3 | 1.9 | 3.4 | 45.2 | 12.0 | 39.5 | 1.1 | 1.6 | 20.0 | 1.7 |
| $50,000 to $99,999 | 93.4 | 73.8 | 76.0 | 4.4 | 8.2 | 11.3 | 77.2 | 89.5 | 4.1 | 4.0 | 52.7 | 20.5 | 44.5 | 1.5 | 1.4 | 20.4 | 1.8 |
| $100,000 to $249,999 | 96.2 | 82.5 | 72.3 | 6.7 | 14.1 | 14.2 | 85.7 | 89.0 | 5.4 | 6.5 | 62.9 | 30.1 | 50.3 | 3.4 | 2.8 | 23.9 | 2.1 |
| $250,000 to $499,999 | 98.2 | 89.4 | 67.6 | 12.6 | 26.9 | 17.2 | 92.9 | 92.4 | 9.9 | 12.4 | 75.7 | 47.0 | 56.9 | 6.9 | 7.9 | 30.2 | 4.3 |
| $500,000 and over | 99.0 | 93.7 | 61.5 | 22.5 | 55.4 | 28.6 | 94.5 | 93.8 | 22.9 | 22.0 | 87.6 | 70.2 | 64.1 | 12.9 | 16.1 | 34.3 | 8.2 |
| **Health Insurance Coverage of Household Members** | | | | | | | | | | | | | | | | | |
| Health insurance coverage for all household members all year | 93.2 | 77.4 | 68.1 | 9.4 | 21.3 | 14.2 | 66.6 | 84.4 | 8.2 | 8.8 | 58.4 | 33.2 | 45.9 | 5.1 | 5.7 | 22.5 | 3.3 |
| No health insurance coverage for some or all household members during the year | 84.9 | 62.3 | 72.9 | 4.2 | 8.0 | 18.7 | 46.4 | 78.9 | 4.1 | 3.4 | 31.7 | 12.9 | 26.2 | 1.7 | 1.3 | 11.9 | 1.8 |
| **Disability of Household Members** | | | | | | | | | | | | | | | | | |
| No household member with a disability | 92.9 | 78.1 | 69.5 | 8.8 | 20.6 | 16.6 | 62.7 | 85.7 | 8.0 | 7.8 | 59.8 | 32.5 | 49.2 | 5.7 | 4.6 | 19.5 | 3.0 |
| One or more household members with a disability | 89.7 | 68.6 | 67.8 | 7.8 | 15.9 | 12.2 | 63.6 | 79.4 | 6.5 | 7.9 | 42.8 | 24.5 | 30.1 | 2.4 | 5.4 | 22.7 | 3.1 |
| **Participation in Government Programs** | | | | | | | | | | | | | | | | | |
| None | 95.9 | 83.0 | 68.6 | 10.8 | 24.5 | 16.2 | 71.8 | 88.6 | 9.1 | 10.1 | 65.1 | 37.7 | 51.3 | 5.8 | 6.4 | 24.3 | 3.7 |
| One or more | 82.7 | 56.6 | 69.7 | 3.2 | 6.7 | 12.5 | 43.8 | 72.2 | 3.8 | 2.9 | 28.7 | 11.8 | 23.0 | 1.6 | 1.6 | 12.6 | 1.6 |
| SNAP (food stamps) | 74.7 | 45.3 | 63.4 | 1.9 | 3.5 | 9.0 | 33.8 | 63.0 | 2.2 | 1.4 | 17.8 | 6.2 | 14.1 | 0.8 | 1.0 | 9.8 | 1.0 |
| Medicaid | 82.4 | 55.8 | 70.2 | 3.0 | 6.5 | 12.9 | 42.5 | 71.4 | 3.7 | 2.8 | 27.8 | 11.3 | 22.4 | 1.6 | 1.3 | 11.7 | 1.5 |
| Supplemental Security Income (SSI) | 77.3 | 46.3 | 64.7 | 2.8 | 4.0 | 7.9 | 42.6 | 57.9 | 2.6 | 2.3 | 20.5 | 8.4 | 16.3 | 1.6 | 1.1 | 14.2 | 1.5 |
| WIC | 77.8 | 55.1 | 67.8 | 2.0 | 3.3 | 11.9 | 30.6 | 76.7 | 1.8 | 1.2 | 27.7 | 8.6 | 23.0 | 1.0 | 0.8 | 8.6 | 1.2 |
| **Region** | | | | | | | | | | | | | | | | | |
| Northeast | 94.9 | 78.9 | 69.3 | 11.6 | 22.4 | 13.5 | 60.7 | 74.8 | 7.4 | 7.6 | 57.4 | 33.8 | 44.8 | 6.3 | 5.4 | 23.2 | 3.2 |
| Midwest | 93.2 | 76.5 | 68.2 | 9.2 | 18.2 | 13.8 | 65.8 | 84.1 | 6.7 | 7.9 | 57.0 | 30.1 | 45.3 | 5.1 | 5.1 | 24.0 | 2.5 |
| South | 88.9 | 69.7 | 67.2 | 6.8 | 15.7 | 14.4 | 64.1 | 85.0 | 6.5 | 7.2 | 49.1 | 25.3 | 39.1 | 3.1 | 4.0 | 19.9 | 2.8 |
| West | 92.5 | 78.0 | 72.2 | 8.0 | 22.4 | 18.3 | 60.4 | 86.7 | 9.8 | 9.0 | 55.3 | 33.1 | 43.1 | 4.8 | 5.8 | 16.7 | 3.7 |
| **Housing Tenure** | | | | | | | | | | | | | | | | | |
| Owner | 95.8 | 82.5 | 68.6 | 11.2 | 25.4 | 18.0 | 100.0 | 91.6 | 10.2 | 10.9 | 65.2 | 39.6 | 50.4 | 6.5 | 7.0 | 25.8 | 4.0 |
| Renter | 85.4 | 61.7 | 70.4 | 3.8 | 8.3 | 9.7 | 0.0 | 69.7 | 2.6 | 2.4 | 34.5 | 12.8 | 29.3 | 1.1 | 1.2 | 11.9 | 1.3 |

**Table 2. Percent Holding Assets for Households, by Type of Asset Owned and Selected Characteristics: 2016**

| Characteristic | Assets at Financial Institutions | | | | Stocks and Mutual Fund Shares | Equity in Business or Profession | Equity in Own Home | Equity in Motor Vehicles | Rental Property Equity | Other Real Estate Equity | Retirement accounts | | | | Educational Savings Accounts | Annuities and Trusts | Cash Value Life Insurance | Other Assets |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Interest Earning | Regular Checking Accounts | Other Interest Earning Assets | | | | | | | Total | IRA or KEOGH Accounts | 401K & Thrift Savings Plan | | | | | |

NOTE: Sample excludes group quarters and households in which the household reference person was either living outside the United States in December, living in institutionalized group quarters in December, or was living in a non-permanent accommodation in December. (D) - Cell suppressed due to a small number of observations. 'Other Assets' includes assets from a catch-all question, and includes assets such as coins, jewelry, artwork, mortgages paid to household members, other loans owed to household members, or royalties. A household's participation in government programs is defined as having received benefits from any of the following programs: Supplemental Nutrition Assistance Program (SNAP), Medicaid, Supplemental Security Income (SSI), Special Supplemental Nutrition Program for Women, Infants, and Children (WIC), Temporary Assistance for Needy Families (TANF), and General Assistance (GA). Federal surveys give respondents the option of reporting more than one race. There are two basic ways of defining a race group. A group such as Black may be defined as those who reported Black and no other race (the race-alone or single-race concept) or as those who reported Black regardless of whether they also reported another race (the race alone-or-in-combination concept). This table shows data using the first approach (race-alone). The use of the single race population does not imply it is the preferred method of presenting or analyzing data. The U.S. Census Bureau uses a variety of approaches. Because Hispanics may be any race, data in this table for Hispanics overlap slightly with data for the Black population. Data for American Indians and Alaska Natives are not shown because of their small sample size. The race or Hispanic origin of the householder designates the race or Hispanic origin of the household. The estimates in this table are based on responses from a sample of the population and may differ from the actual values because of sampling variability and other factors. As a result, apparent differences between the estimates for two or more groups may not be statistically significant. For information on sampling and nonsampling error see: https://www.census.gov/programs-surveys/sipp/methodology/sampling.html. The Census Bureau's Disclosure Review Board and Disclosure Avoidance Officers have reviewed this product for unauthorized disclosure of confidential information and have approved the disclosure avoidance practices applied to this release. CBDRB-FY19-POP001-0055.

Source: U.S. Census Bureau, Survey of Income and Program Participation, 2014 Panel, Wave 4
Internet Release Date: 9/25/2019

Exhibit E

# Policy Does Matter:

## Continued Progress in Providing Long-Term Services and Supports for Ohio's Older Population

**SHAHLA MEHDIZADEH, MATT NELSON, ROBERT APPLEBAUM, JANE K. STRAKER**



SCRIPPS GERONTOLOGY CENTER

*An Ohio Center of Excellence*

MIAMI UNIVERSITY

# Policy Does Matter:
# Continued Progress in Providing
# Long-Term Services and Supports
# for Ohio's Older Population

**Shahla Mehdizadeh**

**Matt Nelson**

**Robert Applebaum**

**Jane K. Straker**

**Scripps Gerontology Center**

**August 2017**

**This work was supported by a grant from the Ohio Department of Aging and the Ohio Long-Term Care Research Project funded by the Ohio General Assembly.**

# TABLE OF CONTENTS

List of Tables ................................................................................................................. i

List of Figures ............................................................................................................... ii

Executive Summary ...................................................................................................... iii

Study Recommendations .............................................................................................. v

Background ................................................................................................................... 1

    This Report ............................................................................................................ 1

    Population Growth and Disability .......................................................................... 2

    Long-Term Settings in Ohio .................................................................................. 3

    Ohio's Community Service System ........................................................................ 5

    County Levy Programs .......................................................................................... 5

    Waiver Programs ................................................................................................... 5

    Residential Care .................................................................................................... 8

    Nursing Homes ..................................................................................................... 8

    Residential Care/Assisted Living Facilities .......................................................... 9

Trends in Long-Term Services Use in Ohio ................................................................. 10

    Nursing Facility Use ............................................................................................. 11

    Nursing Facility Resident Characteristics ............................................................ 14

    Nursing Facility Costs .......................................................................................... 21

    Residential Care Facilities Use ............................................................................ 23

    PASSPORT Use and Costs ................................................................................. 26

    Program Disenrollment ........................................................................................ 29

Long-Term Services and Supports System Changes .................................................. 31

    System Balance ................................................................................................... 31

Recommendations ....................................................................................................... 37

# LIST OF TABLES

Table 1. Ohio's Aging Population (2015 - 2030) ........................................................... 3

Table 2. Ohio Population Projections Based on 2015 American Community Census Estimates (Total Population) .............................................................................................................. 3

Table 3. Profile of Ohio's Older Population: Poverty, Disability, and Utilization Rates by Region, 2015 ........................................................................................................................ 7

Table 4. Ohio's Nursing Facility Characteristics, 2015 .................................................... 9

Table 5. Ohio's Residential Care Facility Characteristics, 2015 .................................... 10

Table 6. Ohio Nursing Facility Admissions, Discharges, and Occupancy Rates, 1992 - 2015.... 12

Table 7. Newly Admitted Nursing Facility Residents and Changes in Their Stay Pattern over a Three Year Period (2001 - 2004 and 2011 - 2014) (All Age Groups) Time Period (Percentage Remaining) ........................................................................................................................ 13

Table 8. Demographic Characteristics of Ohio Certified Nursing Facility Residents by Source of Payment, April - June 2016 ............................................................................................ 15

Table 9. Demographic Characteristics of Ohio's Certified Nursing Facility Residents Over Time, 1996, 2006 - 2016 .......................................................................................................... 16

Table 10. Functional Characteristics of Ohio Certified Nursing Facility Residents by Source of Payment, April - June 2016 ............................................................................................ 17

Table 11. Functional Characteristics of Ohio's Certified Nursing Facility Residents Over Time, 1996, 2006 - 2016 .......................................................................................................... 18

Table 12. Demographic Characteristics of Medicaid Residents in Ohio's Certified Nursing Facility Residents by Age Group, April - June 2016 .................................................................... 19

Table 13. Functional Characteristics of Medicaid Residents in Ohio's Certified Nursing Facilities by Age Group, April - June 2016 .................................................................................... 20

Table 14. Length-of-Stay for Medicaid Residents by Age in Ohio's Certified Nursing Facilities, April - June 2014, 2016 .................................................................................................. 21

Table 15. Ohio's Nursing Facility Daily Rates, 2015 .................................................... 22

Table 16. Occupancy and Length-of-Stay in Ohio's Residential Care Facilities, 2013 - 2015.... 23

Table 17. Functional Characteristics of Ohio's Residential Care Facilities Residents, 2015 ....... 24

Table 18. Demographic and Functional Characteristics of Enrollees in the Assisted Living Waiver Program, FY 2008 - 2016 .............................................................................................. 25

Table 19. PASSPORT Expenditures by Type of Service, 2008 - 2016 ........................................ 27

Table 20. Demographic Characteristics of PASSPORT Consumers, FY 1996, 2006 - 2016 ...... 28

Table 21. Functional Characteristics of PASSPORT Consumers, FY 1996, 2006 - 2016 ........... 30

Table 22. Disenrollment Reasons for PASSPORT and Assisted Living Waiver Program Participants ...................................................................................................................... 31

## LIST OF FIGURES

Figure 1. Proportion of Ohio's Population Age 60 and Older with Severe Disability by Care Setting, 2015 (N = 164,250) ........................................................................................ 4

Figure 2. Average Daily Nursing Facilities Census, 1997 - 2015 ................................................ 13

Figure 3. Average Nursing Facility Per Diem by Source of Payment in 2015 Dollars, 1998 - 2015 ................................................................................................................................. 22

Figure 4. Distribution of Ohio's Long-Term Care Services and Supports Use by People Age 60 and Older, 1997 - 2015 ....................................................................................... 32

Figure 5. Medicaid Long-Term Services and Supports for Individuals Age 60 and Older, 1997 - 2015.......................................................................................................................... 33

Figure 6. Number of People Age 60 and Older on Medicaid Residing in Nursing Facility or Enrolled in HCBS (including MyCare) per 1,000 Persons in Population, 1995 - 2015 .............. 34

Figure 7. Percent Distribution of Ohio's Long-Term Care Services and Supports Utilization by People Under 60, 1997 - 2015 ............................................................................... 35

Figure 8. Average Number of People Under Age 60 Receiving LTSS, Paid by Medicaid, 1997 - 2015....................................................................................................................... 36

## EXECUTIVE SUMMARY

## Demographics

- Ohio has the 6th largest population age 65 and over in the nation.
- Between 2015 and 2030 Ohio's overall population growth will be flat with an increase of under 2%.
- Between 2015 and 2030 the population age 65 and older will increase by 40%; the population 80 and older will increase by 46%.
- By 2030 Ohio's older population with severe disability will increase by 43%.

## Costs

- Long-term services in the U.S. cost approximately $242 billion annually.
- In 2016, the median cost of a nursing home in Ohio was $87,600, assisted living was $43,200, and full-time homemaker care was $44,600 per year.
- Less than 5% of Ohioans age 40 and older have private long-term care insurance.
- In 2015, the Medicaid program spent $158 billion nationally on long-term services, accounting for 30% of all Medicaid expenditures.
- In 2015, Ohio spent $7.2 billion on long-term services, which was 35% of total Medicaid expenditures.
- Medicaid represents more than 26% of total state general revenue expenditures.

## Long-Term Services Use

- Between 1995 and 2015 Ohio dramatically changed how it delivered long-term services to older people, with its state rank on home care to nursing home balancing dropping from 47th to 22nd.
- In 1993, more than 90% of elders on Medicaid received long-term services in nursing facilities; today more than half of these individuals receive services in the community.
- Medicaid recipients in the community out-numbered those served in Ohio nursing homes for the first time in 2015.
- Ohio served 6,200 fewer people in nursing homes paid for by Medicaid in 2015 than it did in 1997. This despite more than 100,000 more state residents age 85 and older.
- Ohio's home- and community-based services options, PASSPORT and the Assisted Living Waiver Program funded through the Medicaid waiver and the MyCare Demonstration, now serve approximately 41,000 older individuals each day, making it the second largest waiver in the nation.

iii

## Changes in Long-Term Services Utilization

- The supply of nursing home beds in the state has remained relatively constant over the past two decades, but the number of beds in service did drop by about 1,300 between 2013 and 2015.
- Nursing home admissions increased from 71,000 in 1992 to more than 211,000 in 2015.
- The number of short-term Medicare admissions increased substantially, rising from 30,000 in 1992 to more than 147,000 in 2015.
- The majority of nursing admissions are now for short-term stays; only 16% of all new admissions reside in the facility after three months.
- The proportion of individuals supported by Medicaid who are under age 65 has nearly tripled in the last two decades to approximately one in four individuals served.
- Occupancy rates in Ohio nursing homes were up slightly in 2015, primarily because there are fewer beds in service, but the actual daily census dropped between 2013 and 2015.
- The number of residential care facilities, including those classified as assisted living, has increased from 265 in 1995 to 655 in 2015.
- Study findings show that despite a large increase in expenditures on home- and community-based services, the overall utilization rate for the older population for long-term services has remained constant. The state has successfully shifted how it spends funds, with the increases keeping pace with population growth but with no utilization rate increase.

iv

# STUDY RECOMMENDATIONS

Ohio has made substantial progress in its efforts to provide long-term services and supports to a growing population of older people with severe disability. The changes that have occurred over the last two decades were considered unthinkable 20 years ago. In 1993, 90% of older people with severe disability receiving long-term services through Medicaid did so in an institutional setting. By 2015, more than half of them received services in a community-based setting, typically in their own home, with family members or in an assisted living residence. The state has improved its balance by expanding home- and community-based services and reducing the number of older people using nursing home care. Between 1997 and 2015, the average daily census of older nursing home residents supported by Medicaid decreased by 7,520 (16%). In the same time period, the number of Ohioans age 85 and older increased by more than 100,000. Between 2013 and 2015 the proportion of older people on Medicaid in nursing homes dropped by 5.7%.

Despite this progress, challenges remain. Between 2015 and 2030 Ohio's population over age 65 and age 80 will increase by 40%, and 46% respectively. Thirty-five percent of the state's Medicaid budget is allocated to long-term services; adding costs to a program that already accounts for more than one-quarter of the state's general revenue budget is a serious concern. In response to these and other challenges we offer the following recommendations:

- Ohio needs to continue to evolve in developing an overall strategy to prepare for the unprecedented increase in the older population. Today more than half of all older people in Ohio with severe disability use long-term services funded through the Medicaid program. If the disability rate remains constant between now and 2040, the economic challenges to the state could be overwhelming. Today, 90% of older people living in the community do not use Medicaid, but two-thirds of nursing home residents rely on the program. Moderate and middle income elders typically do not turn to Medicaid until they require nursing home care or their disability becomes so severe that they need substantial assistance. As the older population increases, the state must consider how to reduce the proportion of older people that will need Medicaid assistance. One way to do this is to expand activities to prevent or delay disability, however many federal funding sources, such as Medicare and Medicaid, provide almost no support for such initiatives.

- Ohio can embrace technology and environmental adaptation to help older people with disability to remain independent in the community. Computer processing power has increased and the future will include robotics, with substantial potential impact in the key areas of transportation and personal care. Ohio already has established sectors of high technology; applying this innovation to elder issues is a potentially vital area of economic and social development that would not only fuel the state economy, but could also assist the state in providing assistance to a growing population.

- Even with technology, long-term services, regardless of setting, will remain a labor intensive and personal set of services. Ohio should continue efforts to better train and support the direct-care workforce. Our survey of nursing homes found an average retention rate of 66% of state trained nursing assistants; in some facilities those rates are below 20%, meaning that a large number of direct-care workers stay less than one year on the job. Wages and benefits, staffing patterns, organizational structure, market conditions, and a host of other factors have been shown to impact workforce quality and rates of turnover. However, our data show that even in similar labor markets, variation in retention rates are significant, suggesting that technical assistance and administrative and policy changes can have a considerable impact in this area.

- Nearly one in four Ohio nursing home residents are under the age of 60. About 45% of this group stays three months or less, indicating that Medicaid has become a short-term rehabilitation funding source for younger participants. However, three in ten of the under-60 age group are nursing home residents for one year or more. This age group generally has lower overall rates of physical disability which has raised questions about the appropriateness of the nursing home setting for these individuals. As Ohio has expanded home- and community-based service options it has also made considerable effort to make sure individuals of all ages reside in the appropriate settings. A recent evaluation of the Money Follows the Person program found that Ohio had the largest number of transitions in the nation in 2015 and 43% of those leaving the facilities were individuals with mental illness (Irvin et al., 2017). A comprehensive study of what contributes to length-of-stay for this age group is warranted.

- This dramatic increase in short-term nursing home stays has major implications for program policies and procedures. For example, in 1993 Ohio implemented an extensive pre-admission screen and resident review requirement for individuals being admitted to Ohio's skilled nursing facilities. At that time there was concern that individuals were entering nursing homes inappropriately, without understanding possible home- and community-based service options. In 1993, when pre-admission screening was initially implemented, about 60% of those admitted continued to reside in the facility after three months, compared to 16% in 2014. This means that Ohio is spending a considerable amount of resources doing a pre-admission review for individuals who will stay only a short period of time. Although the current approach needs to be modified there are individuals being admitted to skilled nursing facilities who could benefit from either the pre-admission screen or the resident review used to identify mental health needs of those being admitted, suggesting that a modified or delayed review is necessary in some circumstances.

The last two decades have demonstrated that state policy does matter. Ohio has gone from ranking 47th to 22nd in the nation for balancing long-term services between institutional and home- and community-based settings. At the same time, the expansion of home- and community-based services did not increase the overall utilization rate for Medicaid long-term services. Despite this major progress, the path forward will be even more difficult than the road already travelled.

## BACKGROUND

Ohio has 2.6 million people over the age of 60 and more than 1.85 million individuals over the age of 65, which translates into the 6th largest older population in the nation. In addition to having a large number of older people, Ohio also has a high proportion of older citizens (15%) ranking 14th on that national indicator (Reinhard, et al., 2017). Projections indicate that by 2030, almost 22% of the state's population will be age 65 and older; this will earn Ohio a proportional ranking of 8th highest nationally. An even greater challenge is that the number of individuals age 85 and older will grow from 260,000 to 675,000 (a 160% increase) by 2050. Ohio's population of older adults (age 60 and over) with physical and cognitive impairments resulting in severe disability and the group of older adults most in need of long-term services was 169,000 in 2016. That group alone is projected to surpass 235,000 (a 39% increase) by 2030, while Ohio's overall population growth will be 2%. These demographic changes, both short- and long-term, are unprecedented in the history of our state and nation. While we celebrate the progress associated with a long-lived society, such accomplishments also present new and growing challenges for the state.

One of the critical issues faced by Ohio and other states is the growing cost of long-term services and supports. With total national long-term services spending over $242 billion, these expenditures represent a continuing challenge for both individuals and government (Harris-Kojetin, et al., 2016). The 2016 Genworth national long-term care analysis reported that the median cost of a private nursing home in Ohio was $87,600 annually; assisted living was $43,200; and a full-time homemaker service was $44,600 per year. Only a small proportion of Americans have long-term care insurance, thus such expenditures represent out-of-pocket contributions for most. Recent data showed that 4.6% of Ohioans age 40 and older had private long-term care insurance, just below the national average of 5% (Reinhard, et al., 2017). Because of the very high costs of long-term care, and the small proportion of individuals with private long-term care insurance, many Americans, particularly those that require nursing home care, eventually need assistance from the public Medicaid program. Medicaid spent $158 billion nationally on long-term services in FY 2015 (both state and federal share). Ohio accounted for about $7.2 billion of that total. Medicaid expenditures represent a significant share of Ohio's budget with FY 17 state-only Medicaid expenditures accounting for about 26.5% of total state expenditures. Thirty-five percent of Ohio's Medicaid expenditures were allocated to long-term services, compared to 30% for the nation overall (Eiken, Sredl, Burwell, and Woodward, 2017). When these high expenditures are coupled with state population projections it is clear why Ohio has been actively involved in system reform and why this area will continue to present challenges over the next 25 years.

## THIS REPORT

In 1993, the Ohio Legislature and the Ohio Department of Aging (ODA) recognized that providing long-term services to a growing population of older individuals presented current and

future financial and delivery system issues for the state. With a desire to have future decisions based on empirical information, the state embarked on an extensive data collection effort to track the use of long-term services and supports by older Ohioans with severe disability. This study, now completing its 24th year, is designed to provide Ohio policy makers, providers, and consumers with the information needed to make good decisions to ensure that Ohio has an efficient and effective long-term services system.

It is unusual for a state to be able to look two decades into the future to anticipate and respond to a potential problem. In fact, in their report, States' Use of Cost-Benefit Analysis: Improving Results for Taxpayers, PEW Charitable Trust-MacArthur Foundation used Ohio's work in this area as an example of how a state can use data to make good decisions. This report described Ohio's response to the changing demographics over the past two decades and identifies issues for the future. State policy makers, providers, consumer groups, and researchers have all recognized these trends, and dramatic changes have been made in Ohio. Despite this substantial progress, the path ahead will be even more difficult than the trail of change that Ohio has already travelled.

## POPULATION GROWTH AND DISABILITY

The aging of the baby boomers has received considerable attention in the past decade. In combination with a low fertility rate and outmigration of the working age population Ohio is aging, as is the nation overall (See Table 1). Between 2015 and 2030, Ohio's overall population growth is estimated to be below 2%. However, as a result of population aging over this same time period, the population age 60 and over will grow by 30%; the population age 65 and older will increase by 40%; the 80 and over group will grow by 46%. If our current rates of disability continue, the number of older Ohioans with severe physical and/or cognitive disability will increase by 43%. Additionally, Ohio's overall population with severe disability will increase by 34%, from 195,000 today to almost 262,000 in 2030 (See Table 2). Ohio continues to have a sizeable number of individuals with developmental disabilities and severe mental illness needing long-term services. Although estimates indicate that the overall number comprising these categories will decrease slightly between now and 2030, state policy makers will need to continue to address the challenges associated with long-term service provision across the disability spectrum. However, it is the aging of the population that will result in the largest potential increase in demand for long-term services.

**Table 1. Ohio's Aging Population (2015 - 2030)**

| Age Group | Population 2015 | Population 2030 | Percent Change 2015 - 2030 |
|---|---|---|---|
| All Ages | 11.64 Million | 11.76 Million | 1.6 |
| 60 and over | 2.6 Million | 3.37 Million | 30.0 |
| 65 and over | 1.84 Million | 2.58 Million | 40.2 |
| 80 and over | 482,518 | 704,362 | 46.0 |

*Source:* U.S. Census, Ohio-Population.org. Based on Mehdizadeh, S., Kunkel, S., and Nelson, I. (2014). Revised based on American Community Survey Population Estimates for Ohio for 2015.

**Table 2. Ohio Population Projections Based on 2015 American Community Census Estimates (Total Population)**

| Year | Total Population Statewide | Population with Severe Disability | Total Population with Moderate Disability | Population with Income at or Below 300% Poverty |
|---|---|---|---|---|
| 2015 | 11,575,977 | 189,711 | 133,384 | 100,934 |
| 2016 | 11,598,544 | 194,874 | 134,984 | 103,016 |
| 2020 | 11,688,813 | 215,524 | 141,815 | 111,346 |
| 2025 | 11,718,542 | 238,348 | 149,900 | 122,862 |
| 2030 | 11,701,547 | 261,820 | 156,549 | 134,595 |

*Source:* U.S. Census, Ohio-Population.org. Based on Mehdizadeh, S., Kunkel, S., and Nelson, I. (2014). Revised based on American Community Survey Population Estimates for Ohio for 2015.

## LONG-TERM SETTINGS IN OHIO

For many years, receiving long-term services was synonymous with nursing home care. However, in 2015 the 164,250 older Ohioans (age 60 and over) with severe disability received support in an array of settings. As shown in Figure 1, about one in five older individuals (21.4%) with severe disability were long-stay residents (100 days or longer) in skilled nursing facilities. The majority of these individuals (80%) were supported by Medicaid. Additionally, 5% of older individuals with severe disability (7,700) pay privately to reside in residential care facilities, most often assisted living residences. An expanded Assisted Living Medicaid Waiver Program served about 3,750 individuals daily in 2013 and 5,500 by 2015. These individuals are included in the aging waiver and MyCare data in Figure 1. Even when we are focusing on older people with severe disability, we find that seven in ten reside in the community, either in their own homes or with relatives or friends. More than 41,000 Ohioans, or about one-quarter of older people with severe disability living in the community, receive long-term services through Ohio's Medicaid home- and community-based services (HCBS) waiver programs or MyCare. The MyCare Program, designed to integrate long-term services with acute care for individuals eligible for both Medicare and Medicaid, began in May 2014 in the major urban areas of the state and participants in that program

use HCBS services as part of the integrated services received. Since individuals enrolled in MyCare remain in the demonstration even after nursing home placement, we estimate that 1,100 MyCare enrollees have transitioned from the community to become long-stay nursing home residents.

An additional 5,750 Ohioans with severe disability in the community receive assistance through aging services levies available across the state (3.5%). Finally, many individuals are able to remain at home with the support of family and friends or by purchasing services through the private sector (44%). These data reinforce the importance of family and the local community in the provision of long-term services to Ohio's older population with severe disability.



**Figure 1. Proportion of Ohio's Population Age 60 and Older with Severe Disability by Care Setting, 2015 (N = 164,250)[1]**

[1] Figure includes older individuals who experience a severe disability for 100 days or longer.
* Nursing facility residents paying privately or by their health care provider staying 100 or more days are considered needing long-term services and support and are included here.
** Nursing facility residents with Medicaid as payer are included only if they stayed 100 or more days; Nursing facility residents with Medicare as payer are considered short stay and are not included.

*Source*: Biennial Survey of Long-Term Care Facilities, 2015. MDS 3.0 calendar year 2015. PASSPORT Information Management System (PIMS), 2014 - 2015. Ohio's PACE sites. Cleveland Plain Dealer, spike in geriatric inmate population costs Ohio millions. Retrieved on 7/6/2016 from: http://www.cleveland.com/metro/index.ssf/2016/07/spike_in_geriatric_inmate_popu.html. Human Rights Watch, 2012. Old Behind Bars: The Aging Prison Population in the United States. Retrieved on 4/6/2017 from: http://www.cleveland.com/metro/index.ssf/2016/07/spike_in_geriatric_inmate_popu.html. Medicaid Eligibility File, 2015. 'Ohio Medicaid Basics 2015' Retrieved on 7/21/2015 from: http://www.asiaohio.org/wp-content/uploads/2011/07/MedicaidBasics_2015_Final.pdf. Mehdizadeh, S. Kunkel, S. and Nelson, I. (2014). *Projections of Ohio's Population with Disability by County, 2010-2030.* Scripps Gerontology Center, Miami University, Oxford, OH. www.ohio-population.org. Payne, M. Applebaum, R., Straker, J. (2012). Locally funded Services for Older Population: *A Description of Senior Services Property Tax Levies in Ohio.* Oxford, OH: Scripps Gerontology Center, Miami University. United States Census Bureau. 2016. 2015 ACS 1-year PUMS. Bureau's American Community Survey Office. Web. 1 November 2016 <https://www.census.gov/programs-surveys/acs/data/pums.html>

4

## OHIO'S COMMUNITY SERVICE SYSTEM

As noted, seven in ten older people with severe disability reside in the community. As we have reported in the past, families and privately purchased services provide assistance to four in ten older Ohioans with severe disability. These findings are consistent with national estimates indicating the tremendous amount of long-term services and supports provided to older people by family and friends, with an estimated value of $470 billion annually. Informal care provided to older people in Ohio is estimated to be $16.5 billion annually (Reinhard, Feinberg, Choula, and Houser, 2015). For those Ohioans needing more assistance in their homes than can be provided by family and friends there are two major public sector sources of support for in-home services; county property tax levies and Medicaid waiver programs.

## COUNTY LEVY PROGRAMS

In the mid 1970's, a local advocate in Clermont County expressed concern that the growing older population in her community did not have the necessary services available. After meeting with county officials, she approached the Ohio Legislature with an idea to use property tax levies to support senior services. Following a legislative law change, she returned to Clermont County and championed a successful levy campaign. Today, 74 of Ohio's 88 counties have aging services levies and last year they generated about $165 million. The revenue for Ohio's county levy programs is larger than the combined total funds generated by all of the other 12 states with levy programs. The county levies vary in size and scope with some generating more than $30 million annually and others $50,000 or less (Payne, Applebaum, and Straker, 2012). The levy programs typically target older people with moderate disability, but we estimate that 5,750 elders with severe disability are served by these programs. There is an assumption that by serving older people with moderate disability these levy programs may be helping Ohio in its efforts to assist older individuals with disability to remain in the community. Recent studies have shown that states with a higher level of funds allocated to supportive services, such as home-delivered meals, have a lower proportion of low care residents in nursing homes (Thomas and Mor, 2013).

## WAIVER PROGRAMS

Ohio currently has two Medicaid waiver programs that serve older people with severe disability (PASSPORT, Assisted Living), a state plan program (PACE), and an Integrated Care Demonstration (MyCare) that manages acute and long-term services in conjunction with the waiver programs. PASSPORT and the Assisted Living Waiver Program are jointly administered at the state level by the Department of Medicaid, the single state Medicaid agency, and the Department of Aging, which is responsible for program operations. PACE operates in one site (Cleveland) and is directly managed by the Department of Aging and serves about 400 individuals (360 age 60 and older). MyCare is operated by five independent health plans, and managed by the Ohio Department of Medicaid. PASSPORT and the Assisted Living Waiver Program are operated on a regional level by Ohio's 12 area agencies on aging and one private, non-profit human service

organization. These administrative agencies use care managers to link an array of in-home services to the 41,000 older people participating in these programs every day. About half of these individuals are in the original HCBS waiver programs and the remainder are enrolled in the MyCare demonstration. Regardless of the program, each of the regional administrative agencies determines participant functional eligibility, works with consumers to assess their needs, develops and arranges for services, and monitors the services delivered. The PASSPORT program serves individuals residing in the community and uses care managers to coordinate a package of home-based services. The Assisted Living Waiver Program serves residents in an approved residential care facility and personal care and meal services are provided within the residence. Between May and July 2014 about 60% of Ohioans who were eligible for Medicaid and Medicare became part of the MyCare demonstration. MyCare is designed to integrate long-term services with acute care and these individuals, while continuing to receive home- and community-based services, are no longer technically in the traditional waiver programs. Under the MyCare demonstration the goal is for the area agencies on aging in participating regions to ensure the continuation of home- and community-based services (HCBS), which are combined with acute care to form an integrated package of services. The demonstration is currently being studied by a national evaluation contractor and results should help the state with future strategy in this area.

A profile of state Medicaid HCBS program utilization is provided in Table 3. We present data for Ohio overall, and for the 12 regions of the state. In 11 of the regions the area agencies on aging administer the PASSPORT and assisted living programs. In the Dayton region, this responsibility is shared between the area agency on aging and Catholic Social Services. In 2015, Ohio had 164,250 older people with severe disability and just over half of these individuals had incomes below 300% of poverty. On any given day Ohio waiver programs for older people served more than 41,000 individuals, or about 48% of low income elders with severe disability. In general the urban areas of the state (Cleveland, Dayton, Columbus, Akron, and Cincinnati) report the largest number of program participants. The one exception to this pattern is the Rio Grande region serving more than 4,000 participants. Rio Grande has about 4% of the older population with severe disability and incomes below 300% of poverty, but accounts for 10% of the states total caseload. This translates into a penetration rate of 100% for Rio Grande, compared to the state average of 48%.

6

**Table 3. Profile of Ohio's Older Population: Poverty, Disability, and Utilization Rates by Region, 2015**

| Area Agency on Aging (AAA) | Location | Estimated Total 60+ Population[1] | Estimated Population 60+ with Severe Physical and/or Cognitive Disability[2] | Estimated Population 60+ with Severe Physical and/or Cognitive Disability with Income at or Below 300% of Poverty | Number of HCBS Consumers (PASSPORT, Assisted Living Waiver, Community MyCare, Aging Carve-Out & PACE)[3] | Proportion of Total HCBS Consumers Statewide | Proportion of HCBS Consumers Served with Income at or Below 300% of Poverty |
|---|---|---|---|---|---|---|---|
| 1 | Cincinnati | 333,520 | 20,646 | 9,766 | 3,497 | 8.5 | 35.8 |
| 2 | Dayton | 195,376 | 12,755 | 6,281 | 5,388 | 13.1 | 85.8 |
| 3 | Lima | 83,252 | 5,521 | 2,908 | 908 | 2.2 | 31.2 |
| 4 | Toledo | 207,361 | 13,178 | 6,939 | 2,659 | 6.5 | 38.3 |
| 5 | Mansfield | 123,808 | 7,938 | 4,447 | 1,963 | 4.8 | 44.1 |
| 6 | Columbus | 342,502 | 20,056 | 8,936 | 4,895 | 11.9 | 54.8 |
| 7 | Rio Grande | 101,398 | 6,086 | 3,741 | 4,085 | 9.9 | 109.2 |
| 8 | Marietta | 62,069 | 3,652 | 2,261 | 869 | 2.1 | 38.4 |
| 9 | Cambridge | 119,312 | 7,653 | 4,733 | 1,652 | 4.0 | 34.9 |
| 10A | Cleveland | 489,278 | 32,487 | 16,743 | 6,950 | 16.9 | 41.5 |
| 10B | Akron | 281,262 | 18,097 | 9,306 | 5,137 | 12.5 | 55.2 |
| 11 | Youngstown | 169,897 | 11,255 | 6,419 | 2,198 | 5.3 | 34.2 |
| CSS[4] | Sidney | 79,145 | 4,933 | 2,730 | 980 | 2.4 | 35.9 |
| | Total | 2,588,180 | 164,257 | 85,210 | 41,480 | 100.0 | 48.3 |

\* Average monthly number of individuals enrolled in PASSPORT, Assisted Living Waiver Program, PACE program' Aging Carve-Out waiver and MyCare in 2015.
*Source:* [1] United States Census Bureau. 2016. 2015 ACS 1-year PUMS. Bureau's American Community Survey Office. Web. 1 November 2016 https://www.census.gov/programs-surveys/acs/data/pums.html
[2] Mehdizadeh, S. Kunkel, S. and Nelson, I. (2014). *Projections of Ohio's Population with Disability by County, 2010-2030.* Scripps Gerontology Center, Miami University, Oxford, OH. www.ohio-population.org
[3] Health Policy Institute of Ohio. 2015. '*Ohio Medicaid Basics 2015*' Retrieved on 7/21/2015 from: http://www.asiaohio.org/wp-content/uploads/2011/07/MedicaidBasics_2015_Final.pdf
[4] Catholic Social Services is also a PASSPORT provider in the Dayton region.

7

A number of factors can explain the regional variation. First, our disability estimates are based on statewide rates, and other research indicates there are actual differences across regions (Ge, 2000). Second, the community economic profile, particularly the presence or absence of county levy programs, could have a substantial impact on utilization rates. For example, the five counties in the Cincinnati region generate more than $46 million in levy revenue, while the 10 counties in of the Rio Grande region generate about $2 million. Outreach strategies, organizational and management approaches, and program innovation do vary by site as well. Overall, the waiver programs serve almost half of the older people with severe disability and low income, indicating that the aging waiver programs have a large presence in the state.

## RESIDENTIAL CARE

For about three in ten older Ohioans with severe disability, skilled nursing facilities or residential care facilities (which encompass assisted living residences) are their long-term residential setting. In this section we provide an overview of these two sectors of the long-term care delivery system.

## NURSING HOMES

At the close of 2015, there were 958 skilled nursing facilities in the state containing 92,157 licensed beds (see Table 4). This represents a decrease of about 1,300 licensed beds since 2013. National data in 2014 reported the average state bed supply, in the U.S. was 36/1,000 individuals 65 and older. Ohio's 2015 rate of 47/1,000 gives the state a ranking of 14th highest number of beds in the nation (Centers for Medicare and Medicaid Services, 2015). With the increase in Ohio's aging population and little change in bed supply the state is projected to drop to 42 beds per 1,000 age 65 plus by 2020. This will still place Ohio above the current national average in bed supply.

More than 95% of Ohio's nursing home beds are either free-standing or part of a continuing care retirement community. Twenty skilled nursing facilities (2.1%) are located in hospitals, continuing a drop in hospital-based units. For example, in 2000, there were 59 hospital-based skilled nursing home units, and in 2005 there were 50. Fifteen skilled facilities (1.9%) are county homes, down from 30 in 2000. Ohio nursing homes average 95 beds per facility and three in four are located in urban areas of the state. One in five (19%) Ohio nursing homes are not-for profit.

**Table 4. Ohio's Nursing Facility Characteristics, 2015**

|  | All Nursing Facilities | County Homes | Hospital Based Long-Term Care Unit |
|---|---|---|---|
| **Number of Facilities (as of 12/31/2015)** | 958 | 15 | 20 |
| Licensed/certified nursing facility beds 12/31/15 | 92,157 | 1,628 | 998 |
| Average number of beds available daily | 91,503 | 1,756 | 1,017 |
| Average number of licensed beds | 95 | 103 | 50 |
| **Location (percent)** | | | |
| Urban | 76.2 | 46.7 | 80 |
| Rural | 23.8 | 53.3 | 20 |
| **Ownership (percent)** | | | |
| Proprietary | 79.7 | — | 36.4 |
| Not for profit | 18.1 | — | 54.6 |
| Government | 2.3 | 100.0 | 9.0 |

## RESIDENTIAL CARE/ASSISTED LIVING FACILITIES

Residential care facilities provide personal care to 17 or more individuals and generally have a limit of 120 days of skilled nursing care per person in a year. In 2015, there were 655 residences containing 50,431 beds and 35,979 units; up from 10,711 beds in 1995 (See Table 5). The increase in the number of residential care facility beds is driven by growth in the number of assisted living facilities. Because Ohio does not have a licensing definition of assisted living, we have applied the criteria that a facility must meet to participate in the Assisted Living Medicaid Waiver Program to systematically identify assisted living facilities. Requirements include such elements as a private bedroom and bathroom, locking door, 24-hour staffing, and the availability of a registered nurse. Based on our statewide survey, we estimate that 582 facilities (89%) appear to meet the state definition of assisted living. Currently, 362 facilities of the 582 who meet the assisted living waiver definition (62%) participate in the Ohio Assisted Living Waiver Program, with an average daily census of almost 5,500 individuals (including those who are now part of MyCare).

Residential care facilities report an average of 77 beds and 55 units per residence. Most of the units, while licensed for two occupants typically have one resident, making unit occupancy the more important indicator when analyzing the industry supply and use patterns. Four in five (79%) are located in urban areas, and three in ten (28%) are part of a continuing care retirement community. A variety of room configurations operate under the residential care licensure category, ranging from double occupancy with no private bathroom, to two-bedroom units with kitchen and sitting areas. As a result, the average monthly charge varies considerably, ranging from $685 to $8,995 depending on the type of unit. The overall average statewide rate for a private unit was $4,044 per month for a non-memory care unit. Monthly charges in facilities that meet the assisted living definition were slightly higher than the generic residential care facility ($4,056 vs. $3,921).

9

**Table 5. Ohio's Residential Care Facility Characteristics, 2015**

|  | All RCFs | RCF Only | Assisted Living* |
|---|---|---|---|
| **Number of Facilities** | 655 | 73 | 582 |
| Total licensed RCF beds | 50,431 | 4,229 | 46,202 |
| Total number of units | 35,979 | 3,312 | 32,667 |
| Average number of beds | 77 | 58 | 79 |
| Average number of units | 55 | 45 | 56 |
| **Average Monthly Rate (Private Non Memory) Location (Percent)** | $4,044 | $3,921 | $4,056 |
| Urban | 78.8 | 79.5 | 78.8 |
| Rural | 21.2 | 20.6 | 21.2 |
| **Ownership (percent)** |  |  |  |
| Proprietary | 71.6 | 80.0 | 70.5 |
| Not for profit | 28.4 | 20.0 | 29.5 |

*Defined as meeting the criteria required to participate in Ohio's Assisted Living Waiver Program.
*Source*: Biennial Survey of Residential Care Facilities, 2015.

## TRENDS IN LONG-TERM SERVICES USE IN OHIO

In this section we present data tracking long-term service use in Ohio from 1992 to 2015. Because long-term services are provided in a range of settings through a wide variety of funders, our examination of service use relies on a number of different sources. Information describing the nursing home and residential care industries come from the Biennial Survey of Long-Term Care Facilities conducted by Scripps Gerontology Center in 2016 and covering calendar year 2015. Response rates were high, with 95% of skilled nursing facilities and 90% of residential care facilities completing the online survey. The survey includes basic information about facilities and residents; such as actual beds in service, number of admissions, and rate structure; information from administrators such as industry challenges and special modules that focus on industry issues, such as emergency preparedness and employee safety. We supplement the nursing home survey data with the Medicaid Cost Report, which is completed by each Medicaid certified facility and compiled and provided to us by the Ohio Department of Medicaid. A federal nursing home tracking system-Certification and Survey Provider Enhanced Reports (CASPER) compiled by the Centers for Medicare and Medicaid Services (CMS) also provides industry-level data. To track characteristics of nursing facility residents the study relies on the Nursing Home Minimum Data Set (MDS 3.0) completed by facilities upon resident admission and at least quarterly during a

resident's stay. Resident characteristics come from the second quarter of 2016 (April through June). Data on PASSPORT and assisted living participants come from the PASSPORT Information Management System (PIMS) operated by the Ohio Department of Aging and cover fiscal year 2016.

## NURSING FACILITY USE

The changes experienced in the nursing home industry over the last two decades are truly dramatic. The supply of beds available has remained relatively stable, going from 91,530 in 1992, to 91,503 in 2015, but all other aspects of the industry are different (See Table 6). For example, in 1992, Ohio nursing homes recorded 71,000 admissions, but by 2015 that number had grown to 211,340 (200% increase). In 1992, 30,000 of those entering a nursing home were Medicare admissions; by 1999 that number had grown to 79,000, and in 2015 that number was 146,760. For many individuals the nursing home has become a place for short-term rehabilitation care after an acute hospital event. Much of this change has been driven by the Medicare prospective payment shift, which incentivized hospitals to reduce the average length-of-stay for individuals. There was a small decline in overall admissions between 2013 and 2015, and we believe this reflects recent federal efforts to reduce Medicare spending in nursing homes.

Long-term occupancy rates for Ohio nursing homes have dropped from 92% in 1992 to 85% in 2015. Between 2013 and 2015 Ohio recorded a slight increase in occupancy rates, from 83.9% to 84.7%. However, the overall average daily census was actually down slightly, dropping from 77,900 to 77,550 (See Figure 2). Both the Medicaid and private pay average daily census were lower, but Medicare daily use increased.

Ohio had 1,280 fewer beds in service in 2015 than 2013 and that impacts the occupancy rate calculations. Reflecting the change in allocation of public resources, Ohio nursing homes served 6,200 fewer individuals supported by Medicaid each day in 2015 than they did in 1997. This despite the fact that during this time period Ohio increased its population 85 and older, a group most likely to need long-term services, by about 100,000 individuals.

11

**Table 6. Ohio Nursing Facility Admissions, Discharges, and Occupancy Rates, 1992 - 2015**

| | 1992 | 1999 | 2001 | 2005 | 2009 | 2011 | 2013 | 2015 |
|---|---|---|---|---|---|---|---|---|
| **Adjusted Nursing Facility Beds**[a] | | | | | | | | |
| Total beds | 91,531 | 95,701 | 94,231 | 91,274 | 93,209 | 94,710 | 92,787 | 91,503 |
| Medicaid certified | 80,211 | 93,077 | 87,634 | 87,090 | 90,876 | 90,724 | 89,063 | 88,479 |
| Medicare certified | 37,389 | 47,534 | 62,088 | 86,701 | 91,928 | 91,650 | 90,730 | 89,555 |
| **Number of Admissions** | | | | | | | | |
| Total | 70,879 | 149,838 | 149,905 | 190,150 | 197,233 | 207,148 | 218,992 | 211,338 |
| Medicaid resident | 17,968 | 28,150 | 24,442 | 34,432 | 27,040 | 31,212 | 36,859 | 35,182 |
| Medicare resident | 30,359 | 78,856 | 90,693 | 116,810 | 109,315 | 148,426 | 144,959 | 146,756 |
| **Occupancy Rate (Percent)** | | | | | | | | |
| Total | 91.9 | 83.5 | 83.2 | 86.4 | 84.7 | 83.2 | 83.9 | 84.7 |
| Medicaid resident | 67.4 | 55.4 | 58.5 | 58.8 | 55.4 | 54.9 | 54.3 | 54.3 |

[a]Total beds include private, Medicaid, and Medicare certified beds. Because some beds are dually certified for Medicaid and Medicare, the individual categories cannot be summed. The total beds, Medicaid, and Medicare certified beds are based on the Scripps Biennial Survey, the Medicaid Cost Report, and CASPER.
*Source:* Annual Survey of Long-Term Care Facilities. Ohio Department of Health 1992, Annual and Biennial Survey of Long-Term Care Facilities, Ohio Department of Aging and Scripps Gerontology Center, 1999 - 2015, Ohio Medicaid Cost Report, 2016, Certification and Survey Provider Enhanced Reporting System, 2016.

**Figure 2. Average Daily Nursing Facilities Census, 1997 - 2015**

| Year | Medicare | Medicaid | Private Pay | Total |
|------|----------|----------|-------------|-------|
| 1997 | 7,106 | 54,242 | 23,295 | 84,643 |
| 1999 | 6,021 | 52,158 | 21,037 | 79,910 |
| 2001 | 7,325 | 51,301 | 19,801 | 78,427 |
| 2005 | 10,062 | 51,235 | 17,538 | 78,835 |
| 2007 | 11,077 | 51,536 | 18,495 | 81,108 |
| 2009 | 10,229 | 50,393 | 19,386 | 77,908 |
| 2011 | 9,364 | 49,944 | 19,482 | 78,790 |
| 2013 | 10,293 | 48,118 | 19,497 | 77,908 |
| 2015 | 10,702 | 48,061 | 18,788 | 77,551 |

*Source:* Biennial Survey of Long-Term Care Facilities, 1997 – 2015.

The changes in the use patterns of skilled nursing facilities are dramatic. To get a better understanding of length-of-stay, we followed two cohorts of nursing home residents admitted for the first time 10 years apart for a three-year time period (See Table 7). The first group was admitted in 2001 and many of those admitted stayed only a short period of time. For the 2001 cohort, 43% of all of those admitted were still residents after three months. After six months, fewer than one-third of all of those admitted remained residents. In our 2001 study we reported these findings and discussed how the system was changing. Our recent data for the period 2011 to 2014 show even greater change, with 16% of those admitted remaining as residents after three months. After six months, 12% of all admissions remained in the facility. What was once thought of as "Last Home for the Aged" (a popular book in the 1970's) is now short-term care for most admissions. While there are many individuals who continue to use nursing homes for extended stays, use patterns have changed significantly over the last two decades.

**Table 7. Newly Admitted Nursing Facility Residents and Changes in Their Stay Pattern over a Three Year Period (2001 - 2004 and 2011 - 2014) (All Age Groups)**

| | Admissions | 0-3 Months | At 6 Months | At 9 Months | At 12 Months | At 24 Months | At 36 Months |
|---|---|---|---|---|---|---|---|
| **2001 - 2004** | 15,250 | 43.1 | 32.5 | 20.7 | 16.1 | 9.0 | 5.7 |
| **2011 - 2014** | 23,475 | 16.3 | 12.4 | 11.1 | 10.4 | 8.8 | 8.2 |

Time Period (Percentage Remaining)

*Source:* MDS 3.0 (2011 - 2014) and MDS 2.0 (2001 - 2004).

These findings indicate that the skilled nursing facility of today has become a mixed use provider, delivering both acute and long-term services. There are three major implications of this shift. First, it means that many residents will leave the facility after a brief rehabilitation visit to return to the community. Ensuring that the needed planning occurs so that an individual is able to continue recovery at home requires coordination between the nursing home, the in-home services network and the family or other informal supports. A review of the MDS Section Q item which asks residents at admission about returning to the community found three in five respondents indicated a desire to return home. It is essential that a good system be established so that a short-term resident, who could go home, does not become a long-term resident. This creates considerable communication challenges between nursing home, hospital, and community, and requires a new skill set for all parties in the network.

A second prominent challenge resulting from this shift is the focus on the transition from hospital to nursing home. A major concern now being voiced is that Medicare patients transitioning from hospital to nursing home or community have a very high rate of hospital re-admissions—more than 20% nationally. CMS reimbursement changes are beginning to penalize hospitals for high re-admissions and there is now considerable attention being paid to this issue.

The high volume of short-term residents means that regulatory and quality strategies may need to be altered. For example, the measures used to assess quality, whether it be resident satisfaction or clinical outcomes, may need to be modified. The overall survey approach may also need to be reconsidered. A one-time annual survey with a four to five person team may no longer be the most efficient strategy to monitor quality in this rapidly shifting system.

Finally, the increase in volume suggests that the nursing home pre-admission assessment process, put into place more than 20 years ago to prevent inappropriate long-stay admissions, needs to be modified to reflect these utilization changes. For example, delaying an assessment for those admitted with certain conditions could be warranted.

## NURSING FACILITY RESIDENT CHARACTERISTICS

Understanding who uses Ohio's nursing homes and how much the care costs is important for both individuals and state policy-makers. Individuals age 80 and above, the population most often thought of as using nursing homes in the United States, made up about two-thirds of those living in nursing homes in 1996, but accounted for about half of residents in 2016. Nursing homes today have a growing proportion of individuals under age 65. In the final quarter of 2016, 12% of residents were below age 60; almost one in five were under age 65, and three in ten were under age 70 (See table 8). The Medicaid population has even a higher proportion of individuals in the younger age groups. One in six Medicaid residents are under age 60; more than one-quarter are under age 65 and 35% are under age 70. As shown in Table 9 in 1996, 6.4% of residents were under age 60 compared to today's 12% and the under 65 group has increased from 9% to 19.1% during the same time period. The trend appears to have leveled off as there were minimal

differences between 2012, 2014 and 2016 (See Table 9). The shift in resident ages is associated with other changes in resident characteristics. The proportion of female nursing home residents is now 63.5%, down from almost three in four in 1996. While the majority of residents are not married, the proportion of married residents has increased from 16% in 1996 to 24% in 2016.

These demographic changes are indicative of the shift to short-term use by many nursing home residents. When nursing homes were primarily venues for a long-term services population, we saw an industry that was 75% to 80% female and widowed. As nursing home use becomes an extended hospital stay for many, the profile is becoming more consistent with acute care use patterns for older people. Again, it will be important to make sure the policies, insurance coverage, and support systems shift to acknowledge these changes.

**Table 8. Demographic Characteristics of Ohio Certified Nursing
Facility Residents by Source of Payment,
April - June 2016**

|  | All (Percentages) | Medicaid (Percentages) | Medicare (Percentages) |
|---|---|---|---|
| **Age** |  |  |  |
| 45 and under | 2.1 | 2.9 | 1.2 |
| 46-59 | 9.9 | 13.6 | 6.5 |
| 60-64 | 7.1 | 8.9 | 4.6 |
| 65-69 | 9.6 | 10.1 | 12.3 |
| 70-74 | 9.9 | 9.6 | 12.6 |
| 75-79 | 12.3 | 11.4 | 15.5 |
| 80-84 | 14.5 | 12.8 | 16.1 |
| 85-89 | 16.7 | 14.3 | 17.3 |
| 90-94 | 12.4 | 11.1 | 10.4 |
| 95+ | 5.4 | 5.3 | 3.5 |
| **Average Age** | 77.2 | 75.2 | 77.8 |
| **Gender** |  |  |  |
| Female | 63.8 | 65.7 | 59.6 |
| **Race** |  |  |  |
| White | 85.3 | 81.0 | 89.4 |
| Black | 13.7 | 17.7 | 9.9 |
| Other | 1.0 | 1.3 | 0.7 |
| **Marital Status** |  |  |  |
| Never Married | 17.9 | 23.9 | 11.1 |
| Widowed/Divorced/Separated | 57.9 | 60.4 | 53.4 |
| Married | 24.2 | 15.7 | 35.5 |
| **Resident Population Size*** | 100,881 | 59,655 | 23,297 |

*Data presented here reflect the characteristics of all residents, and those with Medicare and Medicaid (April - June 2016) as source of payment.
*Source:* MDS 3.0 April - June 2016.

**Table 9. Demographic Characteristics of Ohio's
Certified Nursing Facility Residents Over Time,
1996, 2006 - 2016**

| | 1996 (Percentages) | 2006 (Percentages) | 2012 (Percentages) | 2014 (Percentages) | 2016 (Percentages) |
|---|---|---|---|---|---|
| **Age** | | | | | |
| 45 and under | 2.6 | 2.7 | 2.3 | 2.1 | 2.1 |
| 46–59 | 3.8 | 9.1 | 10.4 | 10.4 | 9.9 |
| 60–64 | 2.6 | 4.5 | 6.4 | 6.5 | 7.1 |
| 65–69 | 4.4 | 5.9 | 7.9 | 8.3 | 9.6 |
| 70–74 | 8.1 | 8.1 | 9.5 | 9.7 | 9.9 |
| 75–79 | 13.1 | 13.2 | 12.0 | 12.1 | 12.3 |
| 80–84 | 18.7 | 19.2 | 16.4 | 15.3 | 14.5 |
| 85–89 | 21.2 | 19.4 | 18.2 | 17.6 | 16.7 |
| 90+ | 25.5 | 17.9 | 16.9 | 18.0 | 17.9 |
| **Average Age** | 80.7 | 78.4 | 77.3 | 77.5 | 77.2 |
| **Gender** | | | | | |
| Female | 73.5 | 68.5 | 65.5 | 65.1 | 63.8 |
| **Race** | | | | | |
| White | 88.3 | 86.3 | 86.0 | 85.5 | 85.3 |
| **Marital Status** | | | | | |
| Never married | 13.8 | 15.1 | 16.1 | 16.7 | 17.9 |
| Widowed/Divorced/ Separated | 70.7 | 63.7 | 58.7 | 59.9 | 57.9 |
| Married | 15.5 | 21.2 | 25.2 | 23.4 | 24.2 |
| **Population** | 80,417♦ | 92,297♦ | 107,737* | 101,279* | 100,881* |

♦Residents present at the end of the quarter specified above.
*Data presented here reflect the characteristics of all residents that spent some time in a nursing facility during the quarter specified above.
*Source:* MDS Plus April - June 1996. MDS 2.0 April - June 2006, 2010. MDS 3.0 April - June 2012 - 2016.

    In addition to examining the demographic characteristics, we also review the disability patterns for nursing home residents over time. The primary approach used to measure disability rates for residents is through an assessment of functional ability based on a measure of activities of daily living (ADL). These tasks of daily living include such areas as the ability of the resident to bathe, dress, and transfer from bed to chair. In general, to be eligible to receive nursing home care as reimbursed by Medicaid, an individual needs to have limitations requiring hands-on assistance in at least two activities of daily living or cognitive impairment such that they are unable to make day-to-day decisions. This is referred to as meeting nursing home level of care. Dementia limitations are factored into the assessment. On average, today's nursing home residents are quite

16

impaired, averaging between four and five activity of daily living limitations (See Tables 10, 11). This level of disability has been consistent over the past decade. However, we have seen an increase in the very disabled population with individuals with four or more impairments going from 76% to 82% during the 20 year time period. We have also seen an increase in resident incontinence, going from 60% to more than 70%. Finally, about 11% of residents record none or one activity limitation and for Medicaid residents the proportion is 13.7%. While increases in the proportion with cognitive difficulty could explain how individuals with limited functional disability are residing in nursing homes, it is important to better understand this finding.

**Table 10. Functional Characteristics**
**of Ohio Certified Nursing Facility Residents**
**by Source of Payment, April - June 2016**

|  | All (Percentages) | Medicaid (Percentages) | Medicare (Percentages) |
|---|---|---|---|
| **Needs Assistance in Activities of Daily Living (ADL)[1]** |  |  |  |
| Bathing | 86.8 | 86.2 | 83.6 |
| Dressing | 85.5 | 82.6 | 86.7 |
| Mobility | 84.7 | 80.1 | 90.2 |
| Toileting | 84.2 | 80.4 | 87.3 |
| Eating | 24.3 | 26.8 | 17.0 |
| Grooming | 82.0 | 80.9 | 79.3 |
| **Number of ADL Impairments[2]** |  |  |  |
| 0 | 6.1 | 8.0 | 4.2 |
| 1 | 4.7 | 5.7 | 4.2 |
| 2 | 3.3 | 3.7 | 3.6 |
| 3 | 4.1 | 4.1 | 5.2 |
| 4 or more | 81.8 | 78.5 | 82.8 |
| **Average Number of ADL Impairments** | 4.5 | 4.3 | 4.4 |
| **Incontinence[3]** | 70.7 | 74.2 | 57.1 |
| **Cognitive Impairment[4]** | 41.0 | 48.6 | 19.7 |
| **Resident Population Size** | 100,881 | 59,655 | 23,297 |

[1] "Needs assistance" includes limited assistance, extensive assistance, total dependence, activity occurred only once or twice, and activity did not occur.

[2] From list above.

[3] "Occasionally, frequently, or multiple daily episodes."

[4] "Moderately" or "severely" impaired.

*Source:* MDS 3.0 April - June 2016.

**Table 11. Functional Characteristics of Ohio's
Certified Nursing Facility Residents Over Time,
1996, 2006 - 2016**

| | 1996 (Percentages) | 2006 (Percentages) | 2012 (Percentages) | 2014 (Percentages) | 2016 (Percentages) |
|---|---|---|---|---|---|
| **Needs Assistance in Activities of Daily Living[1]** | | | | | |
| Bathing | 94.3 | 86.9 | 86.2 | 87.2 | 86.8 |
| Dressing | 84.5 | 85.9 | 86.7 | 87.1 | 85.5 |
| Mobility/Transfer♦ | 69.9 | 80.6 | 85.8 | 85.1 | 84.7 |
| Toileting | 76.6 | 81.8 | 85.4 | 84.9 | 84.2 |
| Eating | 38.7 | 29.5 | 26.8 | 26.8 | 24.3 |
| Grooming | 83.9 | 84.0 | 82.6 | 84.0 | 82.0 |
| **Number of ADL Impairments[2]** | | | | | |
| 0 | 4.7 | 6.9 | 5.7 | 5.6 | 6.1 |
| 1 | 6.9 | 4.9 | 4.0 | 4.0 | 4.7 |
| 2 | 4.7 | 3.7 | 3.6 | 3.2 | 3.3 |
| 3 | 7.3 | 4.7 | 4.1 | 4.0 | 4.1 |
| 4 and More | 76.4 | 79.8 | 82.6 | 83.2 | 81.8 |
| **Average Number of ADL Impairments** | 4.5 | 4.5 | 4.5 | 4.6 | 4.5 |
| **Incontinence[3]** | 60.7 | 55.8 | 64.1 | 68.3 | 70.7 |
| **Population**\* | 80,417♦ | 92,297♦ | 107,737* | 101,279* | 100,881* |

♦Residents present at the end of the quarter specified above.
\*Data presented here reflect the characteristics of all residents that spent some time in a nursing facility during the quarter specified above.
♦In 1996 the ADL transferring, one of the components of mobility is reported.
[1]"Needs assistance" includes limited assistance, extensive assistance, total dependence, and activity did not occur.
[2]From list above.
[3]"Occasionally, frequently, or multiple daily episodes."
***Source:*** MDS Plus April - June 1996. MDS 2.0 April - June 2006, 2010. MDS 3.0 April - June 2012 - 2016.

Because of the continuing increase in the Medicaid residents under age 60 we examine this group in comparison to the age 60 and older Medicaid resident population. It should be noted that the majority of the under 60 group (82%) are between the ages of 45 and 59. However, the demographic profile of the under 60 group looks markedly different than the over 60 group of residents (see Table 12). For example, fewer than half of the younger group (47%) is female, compared to 70% of the over 60 group. One-quarter of the under 60 group is black compared to 16% for the older group. Finally, more than half of the under 60 group (56%) have never been married, compared to 18% for the older group.

18

The disability rates for the residents under age 60 are also quite different, averaging almost one less activity impairment than the older group (see Table 13). More importantly, 28% of the under 60 group record zero or one activity impairment, compared to 11% for the over 60 group. Many residents in the under 60 group are very impaired, with six in ten individuals having four or more activity limitations, compared to 82% for the over 60 group, but the high proportion of the lower impaired group warrants further study.

**Table 12. Demographic Characteristics of Medicaid Residents in Ohio's Certified Nursing Facility Residents by Age Group, April - June 2016**

|  | Under 60 Years (Percentages) | 60 Years and Older (Percentages) |
|---|---|---|
| **Age** | | |
| Less than 45 | 17.8 | — |
| 45–59 | 82.2 | — |
| 60–64 | — | 10.7 |
| 65–69 | — | 12.1 |
| 70–74 | — | 11.5 |
| 75–79 | — | 13.7 |
| 80–84 | — | 15.3 |
| 85–89 | — | 17.1 |
| 90–94 | — | 13.2 |
| 95+ | | 6.4 |
| **Average Age** | 51.3 | 79.9 |
| **Gender** | | |
| Female | 46.7 | 69.5 |
| **Race** | | |
| White | 73.6 | 82.4 |
| Black | 25.0 | 16.3 |
| Other | 1.4 | 1.3 |
| **Marital Status** | | |
| Never married | 55.5 | 17.7 |
| Widowed/Divorced/Separated | 32.5 | 65.8 |
| Married | 12.0 | 16.5 |
| **Total Residents·** | 9,857 | 49,798 |
| **Percent of Residents** | 16.5 | 83.5 |

·The data present the characteristics of the Medicaid residents that spent some time in a nursing facility between April and June 2016.
*Source:* MDS 3.0 April - June 2016.

**Table 13. Functional Characteristics of Medicaid Residents in Ohio's
Certified Nursing Facilities by Age Group, April - June 2016**

| | Under 60 Years (Percentages) | 60 Years and Older (Percentages) |
|---|---|---|
| **Needs Assistance in Activities of Daily Living (ADL)[1]** | | |
| Bathing | 71.7 | 89.1 |
| Dressing | 67.4 | 85.6 |
| Mobility | 65.6 | 83.0 |
| Toileting | 65.2 | 83.4 |
| Eating | 21.2 | 28.0 |
| Grooming | 65.2 | 84.0 |
| **Number of ADL Impairments[2]** | | |
| 0 | 19.1 | 5.7 |
| 1 | 8.5 | 5.2 |
| 2 | 5.0 | 3.4 |
| 3 | 5.5 | 3.8 |
| 4 or more | 61.9 | 81.9 |
| **Average Number of ADL Impairments** | 3.7 | 4.5 |
| **Incontinence[3]** | 53.6 | 78.1 |
| **Cognitive Impairment[4]** | 21.4 | 54.0 |
| **Residents[*] (Number)** | 9,857 | 49,798 |

*The data present the characteristics of all residents that spent some time in a nursing facility between April and June 2016 by age.
[1]"Needs assistance" includes limited assistance, extensive assistance, total dependence, and activity did not occur.
[2]From list above.
[3]"Occasionally, frequently, or multiple daily episodes."
[4]"Moderately" or "severely" impaired.
*Source:* MDS 3.0 April – June 2016.

In an effort to learn more about Medicaid residents we also examined length-of-stay for these individuals. As shown in Table 14, four in ten of the under 60 group have stays of 30 days or less. An additional 9% of the under 60 group are residents for less than three months. This proportion (48%) represents a big jump from 2014 when the rate was 37%. Comparing the under and over age 60 Medicaid groups we see a substantial difference. Almost half of the under 60 group stayed three months or less, compared to just over one-quarter of the over 60 Medicaid residents. The high rate of short-term stays by Medicaid residents indicates that the same short-term rehabilitation trends that we have seen for Medicare are also now occurring in the Medicaid program. At the same time, almost one in five Medicaid residents under age 60 stay two years or longer, compared to 28% for the older age group. This suggests that the under 60 group is quite diverse and administrative staff and policy makers should carefully examine the needs of this group of residents.

20

**Table 14. Length-of-Stay for Medicaid Residents by Age in Ohio's Certified Nursing Facilities, April - June 2014, 2016**

|  | Under Age 60 | | Over Age 60 | |
|---|---|---|---|---|
|  | 2014 Percentage | 2016 Percentage | 2014 Percentage | 2016 Percentage |
| **30 days or less** | 27.5 | 39.2 | 12.9 | 20.5 |
| **31 to 60 days** | 5.1 | 5.0 | 4.1 | 4.0 |
| **61 to 90 days** | 4.4 | 3.8 | 3.5 | 3.1 |
| **91 to 180 days** | 12.7 | 10.2 | 11.0 | 10.6 |
| **181 to 365 days** | 14.7 | 11.9 | 16.2 | 15.2 |
| **One Year to Two Years** | 14.2 | 11.8 | 20.5 | 18.8 |
| **Two Years to Three Years** | 7.3 | 6.4 | 11.7 | 10.3 |
| **More than Three Years** | 14.1 | 11.8 | 20.1 | 17.5 |
| **Total Residents** | 8,427 | 9,857 | 45,147 | 49,798 |

*Source:* MDS 3.0 April - June 2014, 2016

## NURSING FACILITY COSTS

In this section we present information about the costs of nursing home care in Ohio. As shown in Table 15 an array of payment sources exist for nursing home care. Medicaid is the largest source of funding and the average daily reimbursement rate in 2015 was $178. Medicare reimbursement varies depending on whether the resident is in the fee-for-service system or in a Medicare Advantage managed care plan. In 2015 the average Medicare fee-for-service rate was $436 and the Medicare managed care rate was $379. The Medicare rate includes the cost of medications and therapies, neither of which are included in the Medicaid or private pay rate. The average single occupancy private pay rate was $254 and the shared room rate was $227. The private insurance rate of $323 per day includes both health insurance rehabilitation coverage and private long-term care insurance. Finally, the Veterans daily rate was reported to be $277 per day.

In Figure 3 we present the nursing home reimbursement rates and private pay changes for the time period 1998 to 2015. All of the yearly rates are presented in 2015 dollars. Results show that over this time period nursing home reimbursement rate changes have varied depending on funding source. The private pay shared room charge was $221 per day in 1998 (in 2015 dollars) and was $226 in 2015. The Medicare rate has shown a moderate increase above inflation, going from $416 in 1998 to $436 in 2015. The Medicaid program has actually seen a reduction in reimbursement rate when holding inflation constant. In 1998 the daily rate was $195 (2015 dollars); in 2001 the adjusted rate was $217 and the 2015 Medicaid daily rate was $178. Ohio's Medicaid reimbursement rate relative to other states has changed. In 2003, Ohio's rate was the sixth highest in the nation and in 2009, the last year of published national data, the Ohio rate had a ranking of 21.

21

**Table 15. Ohio's Nursing Facility Daily Rates, 2015**

|  | All Nursing Facilities | County Homes | Hospital Based Long-Term Care Unit |
|---|---|---|---|
| **Number of Facilities** | 958 | 15 | 20 |
| **Average Daily Charge (dollars)** | | | |
| Medicaid | 179 | 165 | 177 |
| Medicare | 436 | 383 | 400 |
| Medicare Advantage & EverCare | 381 | 389 | 387 |
| NF private pay (private room) | 254 | 222 | 332 |
| NF private pay (shared room) | 227 | 207 | 284 |
| Private insurance | 328 | 341 | 524 |
| Veterans | 277 | 247 | 318 |

*Source:* Biennial Survey of Long-Term Care Facilities, 2015.

**Figure 3.  Average Nursing facility Per Diem by Source of Payment in 2015 Dollars, 1998-2015**



*Source:* Annual Survey of Long-Term Care Facilities. Ohio Department of Health 1992, Annual and Biennial Survey of Long-Term Care Facilities, Ohio Department of Aging and Scripps Gerontology Center, 1999 - 2015, Ohio Medicaid Cost Report, 2016, Certification and Survey Provider Enhanced Reporting System, 2016. For inflation adjustment used December CPI from Bureau of Labor Statistics 'CPI Inflation Calculator' retrieved on 5/25/2017 from: https://data.bls.gov/cgi-bin/cpicalc.pl?

## RESIDENTIAL CARE FACILITIES USE

The growth in licensed residential care facilities has been dramatic. From 1995 to 2015, the number of facilities increased from 265 to 655, and the number of beds increased from 10,700 beds in 1995, to 50,430 in 2015. Much of the growth has occurred as a result of the development of the assisted living industry. As noted earlier, we estimate that 582 facilities would meet the Medicaid waiver definition of an assisted living residence. As of May 2017, 362 of these facilities were participating in the Assisted Living Medicaid Waiver Program. A review of residential care facility use patterns finds an overall unit occupancy rate of 88.9%; up slightly from 2013 (see Table 16.) Occupancy rates in residential care facilities appear to have been bolstered as a result of the expansion of the Assisted Living Waiver Program, which by 2015 had grown to about 5,500 residents per day. For example, the assisted living unit occupancy rate in 2005 was 78%, in 2009 it was 81.0% and in 2015 it was 89.3%. The residential care facilities not participating in the waiver also saw an increase in occupancy rates, with a 2015 unit occupancy rate of 85.3% compared to 81% in 2009 and 77% in 2005. Data from the most recent Ohio resident satisfaction survey found that the average resident lived in their facility for about two and one-half years; a slight decrease from 2013.

**Table 16. Occupancy and Length-of-Stay in Ohio's Residential Care Facilities, 2013 - 2015**

|  | Overall (Percentages) | | RCF Only (Percentages) | | Assisted Living (Percentages) | |
|---|---|---|---|---|---|---|
|  | 2013 | 2015 | 2013 | 2015 | 2013 | 2015 |
| Unit Occupancy | 87.8 | 88.9 | 84.2 | 85.3 | 88.5 | 89.3 |
| Bed Occupancy | 67.3 | 70.6 | 70.8 | 72.1 | 66.5 | 70.4 |
| Average Length-of-Stay (Days) | 867 | 823 | 877 | 872 | 865 | 821 |

*Source:* Biennial Survey of Residential Care Facilities, 2013 – 2015. Resident Satisfaction Survey (Vital Research), 2015.

Information on the characteristics of individuals who use residential care facilities is presented in Table 17. Unlike our nursing home data, which are based on individual records, these findings represent summary estimates provided by the facilities. To generate these numbers, facilities were asked to report on the number of their residents with a functional impairment in areas such as bathing, dressing, and cognitive functioning. The proportion of residents in each facility was calculated and then averaged across all residences statewide. These findings indicate that RCF residents had an average age of 85, higher than individuals in the home care waiver or nursing home residents. More than four in ten residents had two or more ADL limitations and one in four received skilled nursing care. Reflecting changes in the industry, 29% had a cognitive impairment, an increase from 12% in the 2007 survey.

23

**Table 17. Functional Characteristics of
Ohio's Residential Care Facilities Residents, 2015**

|  | Overall (Percentages)* | RCF Only (Percentages)* | Assisted Living (Percentages)* |
|---|---|---|---|
| **Number of Facilities** | 655 | 73 | 582 |
| **Average Age** | 85 | 83 | 85 |
| **Needs Assistance in Activities of Daily Living (ADL)** | | | |
| Bathing | 70.0 | 71.8 | 69.8 |
| Dressing | 54.8 | 58.3 | 54.4 |
| Transferring | 27.1 | 28.5 | 27.0 |
| Toileting | 36.7 | 40.0 | 36.3 |
| Eating | 8.3 | 7.4 | 8.4 |
| Medication | 80.4 | 79.3 | 80.6 |
| Walking | 24.9 | 26.3 | 24.7 |
| With two or more activities | 41.1 | 40.1 | 41.2 |
| **Received Skilled Nursing Care** | 26.0 | 25.4 | 26.1 |
| **Behavior Problems** | 7.8 | 12.1 | 7.3 |
| **Cognitive Impairment** | 29.2 | 30.6 | 29.1 |

*Percentages are provided by facilities. The numbers are averaged for all facilities that provided a response to each question.
***Source:*** Biennial Survey of Residential Care Facilities, 2015.

More detailed data are available for participants in the Assisted Living Medicaid Program (See Table 18). The profile of waiver participants has been relatively constant over the course of the program. The average age (around 80) and gender balance (about 80% female) has remained quite stable since 2008. Waiver participants continue to average between two and three activity of daily limitations (2.5) and over one-quarter require partial supervision. The demographic profile has shifted slightly over the years, but the 2016 characteristics are similar to the 2008 numbers. There has been an increase in participants needing 24-hour supervision between 2008 (11.5%) and 2016 (17.6%), while the 2016 percentage is actually down from 2012 (20.3%). Overall the profile of participants in the assisted living waiver has remained relatively constant, since the beginning with the exception of an increase in residents needing 24-hour supervision.

**Table 18. Demographic and Functional Characteristics of Enrollees in the Assisted Living Waiver Program, FY 2008 - 2016**

| Characteristics | 2008 | 2010 | 2012 | 2014 | 2016 |
|---|---|---|---|---|---|
| **Age** | | | | | |
| ≤45 | 1.2 | 0.8 | 0.8 | .9 | 1.4 |
| 46-59 | 7.4 | 6.5 | 6.4 | 7.4 | 7.9 |
| 60-64 | 5.7 | 5.1 | 6.1 | 6.7 | 7.2 |
| 65-69 | 5.3 | 5.4 | 6.5 | 7.8 | 7.7 |
| 70-74 | 8.2 | 7.7 | 7.6 | 8.9 | 8.1 |
| 75-79 | 12.1 | 11.4 | 11.4 | 11.7 | 11.6 |
| 80-84 | 17.7 | 17.0 | 16.4 | 15.6 | 15.2 |
| 85-89 | 23.0 | 22.4 | 20.5 | 20.1 | 20.7 |
| 90-94 | 12.5 | 16.3 | 16.8 | 13.3 | 16.1 |
| 95+ | 6.9 | 7.4 | 7.5 | 7.6 | 4.1 |
| **Average Age** | **79.5** | **80.6** | **81.7** | **79.4** | **79.0** |
| **Gender** | | | | | |
| Female | 79.1 | 80.1 | 80.4 | 78.4 | 78.5 |
| Male | 20.9 | 19.9 | 19.6 | 21.6 | 21.5 |
| **Race** | | | | | |
| White | 88.0 | 88.6 | 89.1 | 84.2 | 88.3 |
| Black | 9.8 | 9.0 | 9.6 | 12.1 | 8.9 |
| Other | 2.2 | 2.4 | 1.3 | 3.7 | 3.8 |
| **Marital Status** | | | | | |
| Non-Married | 93.1 | 92.4 | 91.9 | 90.8 | 91.4 |
| Married | 6.9 | 7.6 | 8.1 | 9.1 | 8.6 |
| **ADL Impairment** | | | | | |
| Bathing | 91.8 | 87.5 | 88.8 | 88.0 | 86.4 |
| Dressing | 48.5 | 49.8 | 51.6 | 50.3 | 49.6 |
| Mobility | 72.4 | 72.6 | 73.3 | 74.6 | 75.0 |
| Toileting | 25.2 | 20.2 | 23.2 | 21.9 | 19.7 |
| Eating | 3.9 | 4.9 | 4.6 | 4.0 | 2.7 |
| Grooming | 22.7 | 20.6 | 20.8 | 18.7 | 17.8 |
| **Average Number of ADL Impairments** | **2.6** | **2.6** | **2.6** | **2.6** | **2.5** |
| **IADL Impairment** | | | | | |
| Community Access | 96.4 | 96.0 | 97.9 | 97.7 | 97.6 |
| Environmental Management | 99.7 | 98.2 | 99.8 | 99.9 | 99.9 |
| Shopping | 97.9 | 97.4 | 97.1 | 97.2 | 97.5 |
| Meal Preparation | 98.3 | 97.1 | 98.1 | 97.5 | 98.6 |
| Laundry | 94.3 | 95.3 | 98.1 | 95.2 | 94.9 |
| Medication Administration | 83.2 | 80.8 | 95.7 | 88.1 | 87.8 |
| **Needs Supervision** | | | | | |
| 24-hour | 11.5 | 13.9 | 20.3 | 18.1 | 17.6 |
| Partial time | 27.8 | 23.4 | 27.3 | 26.2 | 26.1 |
| **Consumers Served** | **413** | **1,943** | **4,102** | **5,788** | **3,416*** |

*Source*: PASSPORT Information Management System (PIMS), 2008 - 2016.

*2016 Sample does not include assisted living residents now in MyCare.

## PASSPORT Use and Costs

Ohio's PASSPORT program began as a two site demonstration in 1984 designed to expand the home- and community-based services available to older people with severe disability. By 1992, the program had expanded across the state serving 4,215 older Ohioans with severe disability. With continued support from state lawmakers and a growing older population the program continued to expand. In 2006, there were 26,000 participants each day and by 2016 some 41,000 older people participated daily in one of the HCBS programs funded through Medicaid (PASSPORT, Assisted Living Waiver, or MyCare Ohio). The HCBS programs use a care manager to assess participant eligibility and need, develop a plan of services, and monitor the individual's condition, circumstances and the services received to make sure that participant needs are being met. In 2007, Ohio developed the Assisted Living Waiver Program as an expanded home- and community-based service and in 2014 the state began an integrated care service delivery demonstration called MyCare. The MyCare demonstration builds on the HCBS waiver programs by adding an array of acute care services designed to integrate the short-term and long-term services systems. MyCare participants with severe disability typically enter the program through the PASSPORT and Assisted Living Waiver Program and so our presentation of enrollment data combine PASSPORT, AL, and MyCare enrollees. We also separate out those who remain in PASSPORT and AL and those who transition to the MyCare demonstration.

PASSPORT and assisted living care managers work with program participants and family caregivers to develop the service plan. Services supported under the PASSPORT Medicaid waiver include personal care, adult day care, home-delivered meals, medical transportation, respite care, and medical equipment. As shown in Table 19, about three-quarters of PASSPORT program service dollars are allocated to personal care and an additional 5% to homemaker services. This is typical for home- and community-based waiver programs, since individuals to qualify must have severe functional impairments to qualify for the program. Regardless of setting, individuals with severe disability rely on support for the tasks of daily living such as bathing, dressing, and meal preparation. About 11% of funds are allocated to home-delivered meals, another core component of the home care system. Other expenditure categories are transportation (4.3%), adult day care (3%), and medical equipment and supplies (2.2%).

**Table 19. PASSPORT Expenditures by Type of Service, 2008 - 2016**

| Type of Services | FY 2008 (Percentages) | FY 2010 (Percentages) | FY 2012 (Percentages) | FY 2014 (Percentages) | FY 2016 (Percentages) |
|---|---|---|---|---|---|
| Personal care | 75.6 | 71.3 | 67.6 | 69.0 | 73.6 |
| Home-delivered meals | 11.2 | 14.8 | 15.8 | 12.0 | 10.9 |
| Adult day services | 3.5 | 2.6 | 2.5 | 3.7 | 2.3 |
| Transportation | 3.8 | 3.5 | 4.4 | 4.4 | 4.3 |
| Home medical equipment and supplies | 2.0 | 2.4 | 2.8 | 2.3 | 2.2 |
| Homemaker services | 1.0 | 1.3 | 2.5 | 5.6 | 5.0 |
| Emergency response | 1.9 | 3.4 | 3.3 | 1.8 | 0.1 |
| Home modification | 0.7 | 0.6 | 0.8 | 0.9 | 0.9 |
| Other | 0.3 | 0.1 | 0.3 | 0.3 | 0.6 |

*Source*: PASSPORT Information Management System (PIMS), 2008 - 2016.

The PASSPORT program continues to serve a higher proportion of women (74%) and a high proportion of individuals who are not married (79%). However, the profile of participants has changed in some important ways over the last two decades (See Table 20). Today the program serves many more individuals under age 70 (39.5%) than 10 years ago (27%), with the average age dropping by more than three years since 1996. The proportion of participants reporting to be never married has increased from 6% in 1996 to 14% today. Even the gender profile has shifted slightly, going from 77% women to 74% over the two decades. Perhaps reflecting the younger age of the group, today a higher proportion of PASSPORT participants live in their own home or apartment, rather than with family or friends (84% vs. 77%) compared to 1996.

**Table 20. Demographic Characteristics of PASSPORT Consumers,
FY 1996, 2006 - 2016**

| PERCENT | FY 1996 | FY 2006 | FY 2012 | FY 2014 | FY 2016 |
|---|---|---|---|---|---|
| **Age** | | | | | |
| 60-64 | 10.5 | 10.7 | 12.2 | 12.2 | 18.0 |
| 65-69 | 13.1 | 16.0 | 18.2 | 19.2 | 21.5 |
| 70-74 | 17.7 | 17.4 | 18.2 | 19.2 | 18.3 |
| 75-79 | 18.8 | 18.5 | 17.0 | 17.4 | 15.7 |
| 80-84 | 17.4 | 18.2 | 15.5 | 14.5 | 12.6 |
| 85-89 | 13.8 | 11.5 | 11.6 | 11.0 | 9.0 |
| 90-94 | 6.5 | 5.8 | 5.4 | 4.8 | 4.2 |
| 95+ | 2.2 | 1.9 | 1.9 | 1.7 | 0.7 |
| **Average Age** | 76.8 | 76.7 | 75.6 | 75.3 | 73.6 |
| **Gender** | | | | | |
| Female | 77.0 | 78.7 | 75.9 | 75.4 | 73.8 |
| **Race** | | | | | |
| White | 72.8 | 74.1 | 70.4 | 65.9 | 71.6 |
| Black | 25.9 | 23.8 | 25.6 | 26.7 | 19.1 |
| Other | 1.3 | 2.1 | 4.0 | 7.2 | 9.3 |
| **Marital Status** | | | | | |
| Never Married | 5.8 | 6.6 | 10.2 | 11.6 | 13.8 |
| Widowed | 56.7 | 49.4 | 41.0 | 37.6 | 33.8 |
| Divorced/Separated | 17.2 | 24.2 | 29.2 | 29.7 | 31.1 |
| Married | 20.3 | 19.8 | 19.5 | 19.8 | 21.3 |
| **Usual Living Arrangement** | | | | | |
| Own home/ apartment | 76.7 | 79.5 | 83.9 | 84.3 | 84.4 |
| Relative or friend | 21.5 | 17.9 | 15.3 | 14.8 | 15.2 |
| Congregate housing for elderly/RCF | 0.6 | 0.2 | 0.2 | 0.2 | 0.1 |
| Nursing facility | 0.9 | 1.3 | 0.3 | 0.7 | 0.2 |
| Other | 0.1 | 1.1 | 0.3 | 0.1 | 0.1 |
| **Number of Consumers Served** | 3,883 | 28,565 | 34,173 | 42,868 | 22,128 |

*Source:* PASSPORT Information Management System (PIMS).

28

The disability profile of PASSPORT participants has remained relatively constant; with participants reporting on average three activities of daily living impairments (See Table 21). Six in ten individuals have three or more ADL impairments. There has been some shifting within the specific ADL items, but we believe this to be the result of changes in assessment guidelines rather than actual shifts in disability rates. More than nine in ten (94%) report four or more instrumental activity limitations in such areas as shopping and meal preparation. One in five participants has a need for supervision. While the demographic profile has shifted slightly, the functional characteristics have remained constant over the past two decades.

## PROGRAM DISENROLLMENT

About 20% of PASSPORT participants and 25% of assisted living waiver residents left the program during 2016. Given the frailty of the program participants, it is not surprising that the two major reasons for disenrollment from PASSPORT or the assisted living was that the participant died or was admitted to a skilled nursing home for more than 30 days (See Table 22). There were some differences by setting. Terminations due to death were higher for the PASSPORT program (37%) compared to the assisted living waiver (28%). The proportion of disenrollments to nursing homes was considerably higher for assisted living (52%) compared to PASSPORT (37%). The nursing home disenrollment rate for PASSPORT continues to drop reflecting efforts to help participants remain in the community as long as possible. In 2008, 38% of PASSPORT participants left the program for long-stay nursing home placement, in 2014 it was 30% and in 2016 the rate was 28%. It will be important to gain a better understanding of why the nursing home disenrollment rate is so much higher for assisted living waiver participants. In our survey of residential care facilities more than half of the respondents reported that the waiver reimbursement rate was a major barrier. This could result in providers being unable to serve the highest care residents, particularly those with dementia. The remaining reasons for disenrollment from both programs are similar and in the case of PASSPORT they have remained relatively stable over time. These results do not include participants in the MyCare demonstration.

Table 21. Functional Characteristics of PASSPORT Consumers, FY 1996, 2006 - 2016

| | FY 1996 (Percentages)[a] | FY 2006 (Percentages)[a] | FY 2012 (Percentages)[a] | FY 2014 (Percentages)[a] | FY 2016 (Percentages)[a] |
|---|---|---|---|---|---|
| **Percentages with Impairment/Needing Hands-On Assistance in Activities of Daily Living (ADL)[b]** | | | | | |
| Bathing | 96.1 | 96.0 | 95.6 | 94.7 | 95.8 |
| Dressing | 64.1 | 60.1 | 62.8 | 62.6 | 66.5 |
| Mobility[c] | 57.8 | 75.6 | 83.9 | 83.6 | 77.1 |
| Toileting | 30.1 | 21.1 | 21.8 | 21.3 | 21.3 |
| Eating | 8.0 | 10.9 | 5.5 | 4.3 | 4.2 |
| Grooming | 59.0 | 32.9 | 29.1 | 26.5 | 29.4 |
| **Number of ADL impairments[*]** | | | | | |
| 0 | 1.5 | 0.8 | 1.1 | 1.4 | 0.7 |
| 1 | 3.7 | 3.5 | 3.4 | 4.1 | 4.2 |
| 2 | 29.3 | 34.6 | 34.2 | 34.8 | 35.1 |
| 3 | 32.0 | 33.6 | 33.9 | 33.4 | 34.0 |
| 4 or more | 33.5 | 27.5 | 27.4 | 26.2 | 26.0 |
| **Average Number of ADL Impairments** | 3.2 | 3.0 | 3.0 | 2.9 | 2.9 |
| **Percentage with Impairment in Instrumental Activities of Daily Living (IADL)** | | | | | |
| Community access[e] | 91.8 | 84.8 | 85.9 | 83.4 | 80.5 |
| Environment management[f] | 99.9 | 95.2 | 99.8 | 99.9 | 99.7 |
| Shopping | 97.5 | 97.4 | 96.6 | 96.2 | 96.3 |
| Meal preparation | 85.3 | 88.5 | 88.3 | 87.9 | 90.0 |
| Laundry | 95.6 | 95.7 | 96.0 | 95.6 | 95.7 |
| Medication Administration | 49.6 | 41.4 | 42.1 | 41.3 | 41.0 |
| **Number of IADL Impairments[**]** | | | | | |
| 0 | 0.0 | 3.9 | 0.1 | .04 | 0.0 |
| 1 | 0.0 | 1.0 | 0.2 | 0.3 | 0.2 |
| 2 | 0.4 | 0.5 | 0.8 | 0.8 | 0.7 |
| 3 | 4.4 | 3.8 | 4.5 | 5.0 | 4.9 |
| 4 or more | 95.2 | 90.8 | 94.5 | 94.7 | 94.3 |
| **Average Number of IADL Impairments[**]** | 5.2 | 4.9 | 5.1 | 5.1 | 5.0 |
| **Supervision Needed[g]** | | | | | |
| 24-hour | --- | 9.5 | 9.6 | 9.1 | 8.0 |
| Partial time | --- | 9.1 | 11.2 | 11.9 | 13.3 |
| **Number of Consumers Served** | 3,883 | 28,565 | 34,173 | 42,868 | 22,128 |

[a] Percentages are adjusted to reflect only those consumers for whom information was available on each variable.
[b] Impairment includes all who could not perform the activity by themselves or could with mechanical aid only.
[c] Needs hands-on assistance with at least one of the following three activities: *bed mobility*, *transfer* or *"locomotion."*
[e] Needing hands-on assistance with using a *telephone*, using *transportation*, or handling *legal or financial matters* constitutes impairment in community access.
[f] Needing hands on assistance with *house cleaning*, *yard work*, or *heavy chores* constitutes impairment in environmental management.
[g] Between June 2001 and September 2004 the Ohio Department of Aging gradually changed to a new PASSPORT information management system designed to keep track of PASSPORT consumers' characteristics and service utilization. Not all the information presented in this report was electronically available prior to this change, therefore some analysis is limited to the PASSPORT sites that changed to the new system prior to July, 2003.
***Source:*** PASSPORT Information Management System (PIMS).

[*] From the list above.

**Table 22. Disenrollment Reasons for PASSPORT and Assisted Living Waiver Program Participants**

| Reasons (percent) | 2012 PASSPORT | 2014 PASSPORT | 2016 PASSPORT | 2016 AL Waiver |
|---|---|---|---|---|
| Died | 45.5 | 38.3 | 36.7 | 27.5 |
| Admitted to Nursing Facility for 30+ Days | 34.0 | 30.4 | 28.3 | 51.8 |
| Admitted to Hospice Care | 0.2 | 0.1 | 0.1 | 0.0 |
| Admitted to Hospital for 30+ Days | 1.0 | 0.9 | 0.7 | 0.3 |
| Did Not Meet Financial Eligibility | 3.0 | 6.5 | 5.2 | 5.0 |
| Could Not Agree on a Plan of Care | 1.2 | 1.6 | 1.4 | 1.5 |
| Did Not Meet Level-of-Care | 1.5 | 1.7 | 0.6 | - |
| No Longer Resides in Ohio | 4.6 | 4.2 | 5.3 | 0.8 |
| Other (including transfer to other waivers) | 3.0 | 6.1 | 12.8 | 8.8 |
| Voluntarily Withdrew from Program | 6.0 | 9.9 | 8.9 | 4.3 |
| Percent Disenrolled | 23.5 | 19.6 | 19.9 | 25.1 |

*Source:* PASSPORT Information Management System (PIMS) 2012 - 2016.

## LONG-TERM SERVICES AND SUPPORTS SYSTEM CHANGES

In this report we have presented data tracking the provision of long-term services in Ohio. In this section we address the impact that these changes have had on system balance.

## SYSTEM BALANCE

In 1993, the initial year of this study, critics consistently identified Ohio as a state system that emphasized the nursing home care option over home- and community-based services. In fact, a report on system balance in the U.S. on data from 1997, ranked Ohio as the 47th least balanced state in the nation (AARP, 2000). Our report has described a substantial expansion of home- and community-based waiver services and a reduction in nursing home use by older people. In combination, these changes mean that Ohio has dramatically changed its long-term services profile and now ranks 22nd for the amount of Medicaid funds allocated to HCBS for older adults and people with physical disabilities (Eiken et al., 2017). As shown in Figure 4, in 1993 more than nine in ten older people receiving long-term services from Medicaid did so in a nursing home setting. By 2015, that ratio had changed so that for the first time ever, more than half of the older individuals receiving long-term services through Medicaid did so in the community (51 to 49

ratio). Ohio has continued its progress in this area and in fact data for the 2013 to 2015 time period reported that Ohio's overall HCBS spending increase (7.3% of total LTSS expenditures) was the second highest in the nation (Eiken et al., 2017).

**Figure 4. Distribution of Ohio's Long-Term Care Services and Supports Use by People Age 60 and Older, 1997-2015**



**Source**: Unpublished Medicaid Claims data, Ohio Department of Medicaid SFY 2005 - 2013. Health Policy Institute of Ohio. 2015.
'*Ohio Medicaid Basics 2015*' Retrieved on 7/21/2015 from: http://www.asiaohio.org/wp-content/uploads/2011/07/MedicaidBasics_2015_Final.pdf.
PASSPORT Information Management System (PIMS) 1993 - 2015.

The strategy that the state used to change was one that recognized the rapidly growing older population and the need to provide a better range of home- and community-based options. The hope of policy makers was that the expansion of options would reduce the rate of nursing home use by older people. Figure 5 illustrates the shift in service settings of Ohio's Medicaid long-term services participants age 60 and older. In 1993, the Medicaid long-term services system served just under 49,000 individuals age 60 and older, with 44,450 (91%) of those persons in the nursing home setting. In 2015, reflecting the large increase in the sheer number of older people, the system served 81,300 older individuals, with 41,180 in the community. The increase in the older population during this time period has been dramatic. For example, in 1995, Ohio had 157,200 individuals age 85 and older and by 2015 that number has grown to over 260,000 (65% increase). Yet between 1997 and 2015 the number of older people on Medicaid in Ohio nursing homes has been reduced by an average of 7,400 individuals each day from 1997.

**Figure 5. Medicaid Long-Term Services and Supports for Individuals Age 60 and Older, 1997 - 2015**



*Source*: Unpublished Medicaid Claims data, Ohio Department of Medicaid SFY 2005 - 2013. Health Policy Institute of Ohio. 2015. '*Ohio Medicaid Basics 2015*' Retrieved on 7/21/2015 from: http://www.asiaohio.org/wp-content/uploads/2011/07/MedicaidBasics_2015_Final.pdf. PASSPORT Information Management System (PIMS) 1993 - 2015.

Figure 6 displays the growth in the number of individuals using long-term services in the context of overall population growth. One of the questions that policy makers asked at the outset of home- and community-based services expansion was, will this growth create demand such that the number of Medicaid participants increases at a faster rate than the overall aging population? To address this question we examine the utilization rates of long-term services as a rate of the number of Ohioans age 60 and older residing in the state. In 1995, the Medicaid long-term services utilization rate was 31.1/1,000 people age 60 and older. In 2015, the rate of 31.5/1,000 was equivalent to the 1995 number. Reflecting the change in balancing, the ratio had changed considerably, with the nursing home use rate dropping from 25/1,000 in 1995 to 15.5/1,000 in 2015. These data indicate that the state strategy did not increase the utilization rate above the growth expected as a result of an increased aging population, but it did change the configuration of services.



**Figure 6. Number of People Age 60 and Older on Medicaid Residing in Nursing Facility or Enrolled in HCS (including MyCare) per 1,000 Persons in Population, 1995 - 2015**

**Source:** Annual and Biennial Survey of Long-Term Care Facilities, 1995-2015. Health Policy Institute of Ohio. 2015. '*Ohio Medicaid Basics 2015*' Retrieved on 7/21/2015 from: http://www.asiaohio.org/wp-content/uploads/2011/07/MedicaidBasics_2015_Final.pdf. Mehdizadeh, S. Kunkel, S. and Nelson, I. (2014). Projections of Ohio's Population with Disability by County, 2010-2030. Scripps Gerontology Center, Miami University, Oxford, OH. www.ohio-population.org. PASSPORT Information Management System (PIMS) 1993-2015. United States Census Bureau. 2016. 2015 ACS 1-year PUMS. Bureau's American Community Survey Office. Retrieved on 11/1/2016 from: https://www.census.gov/programs-surveys/acs/data/pums.html. Unpublished Medicaid Claims data, Ohio Department of Medicaid SFY 2005-2013.

A longitudinal presentation of home care and nursing home use for Ohioans under age 60 is also examined in this work (See Figure 7). Long-term services use by individuals with severe disability under the age of 60 has shifted from 64% Medicaid LTSS participants residing in institutional settings in 1997, to 42% in 2015. The data displayed in Figure 8 indicate that more than 10,652 individuals received home- and community-based Medicaid services in 2015, compared to just 7,558 in the institutional setting.

**Figure 7. Percent Distribution of Ohio's Long-Term Care Services and Supports Utilization by People Under 60, 1997 - 2015**



■ Avg. Daily Medicaid NF Census   ■ Avg. HCBS Enrollment

**Source:** Annual and Biennial Survey of Long-Term Care Facilities, 1997 - 2015. Health Policy Institute of Ohio. 2015. 'Ohio Medicaid Basics 2015' Retrieved on 7/21/2015 from: http://www.asiaohio.org/wp-content/uploads/2011/07/MedicaidBasics_2015_Final.pdf. Mehdizadeh, S. Kunkel, S. and Nelson, I. (2014). Projections of Ohio's Population with Disability by County, 2010 - 2030. Scripps Gerontology Center, Miami University, Oxford, OH. www.ohio-population.org. PASSPORT Information Management System (PIMS) 1993 - 2015. United States Census Bureau. 2016. 2015 ACS 1-year PUMS. Bureau's American Community Survey Office. Retrieved on 11/1/2016 from: https://www.census.gov/programs-surveys/acs/data/pums.html. Unpublished Medicaid Claims data, Ohio Department of Medicaid SFY 2005-2013.

**Figure 8**. Average Number of People Under Age 60 Receiving LTSS,
Paid by Medicaid, 1997 - 2015



| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 3,684 | 6,332 | 7,537 | 6,060 | 7,422 | 7,513 | 7,652 | 8,349 | 8,729 | 10,652 |
| 6,590 | 5,763 | 6,418 | 6,956 | 7,683 | 7,720 | 7,271 | 8,390 | 7,568 | 7,558 |
| 1997 | 1999 | 2001 | 2003 | 2005 | 2007 | 2009 | 2011 | 2013 | 2015 |

■ Avg. Daily Medicaid NF Census  ■ Avg. HCBS Enrollment

*Source:* Annual and Biennial Survey of Long-Term Care Facilities, 1997 - 2015. Health Policy Institute of Ohio. 2015. '*Ohio Medicaid Basics 2015*' Retrieved on 7/21/2015 from: http://www.asiaohio.org/wp-content/uploads/2011/07/MedicaidBasics_2015_Final.pdf. Mehdizadeh, S. Kunkel, S. and Nelson, I. (2014). *Projections of Ohio's Population with Disability by County, 2010 - 2030.* Scripps Gerontology Center, Miami University, Oxford, OH. www.ohio-population.org. PASSPORT Information Management System (PIMS) 1993 - 2015. United States Census Bureau. 2016. 2015 ACS 1-year PUMS. Bureau's American Community Survey Office. Retrieved on 11/1/2016 from: https://www.census.gov/programs-surveys/acs/data/pums.html. Unpublished Medicaid Claims data, Ohio Department of Medicaid SFY 2005-2013.

# RECOMMENDATIONS

Ohio has made substantial progress in its efforts to provide long-term services and supports to a growing population of older people with severe disability. The changes that have occurred over the last two decades were considered unthinkable 20 years ago. In 1993, 90% of older people with severe disability receiving long-term services through Medicaid did so in an institutional setting. By 2015, more than half of them received services in a community-based setting, most typically their own home or with a family member. The state has improved its balance by expanding home- and community-based services and reducing the number of older people using nursing home care. Between 1997 and 2015, the average daily census of older nursing home residents supported by Medicaid decreased by 7,520 (16%). In the same time period, the number of Ohioans age 85 and older increased by more than 100,000. Between 2013 and 2015 the proportion of older people on Medicaid dropped by 5.7%.

Despite this progress, challenges remain. Between 2015 and 2030 Ohio's population over age 65 and age 80 will increase by 40% and 46%, respectively. Thirty-five percent of the state's Medicaid budget is allocated to long-term services; adding costs to a program that already accounts for more than one-quarter of the state's general revenue budget is a serious concern. In response to these and other challenges we offer the following recommendations:

- Ohio needs to continue to evolve in developing an overall strategy to prepare for the unprecedented increase in the older population. Today more than half of all older people in Ohio with severe disability use long-term services funded through the Medicaid program. If the disability rate remains constant between now and 2040, the economic challenges to the state could be overwhelming. Today, 90% of older people living in the community do not use Medicaid, but two-thirds of nursing home residents rely on the program. Moderate and middle income elders typically do not turn to Medicaid until they require nursing home care or their disability becomes so severe that they need substantial assistance. As the older population increases, the state must consider how to reduce the proportion of older people that will need Medicaid assistance. One way is to expand activities to prevent or delay disability, however many federal funding sources, such as Medicare and Medicaid, provide almost no support for such initiatives. The Ohio Department of Aging is now supporting several evidence-based practice programs, such as A Matter of Balance and Chronic Disease Self-Management. However, the amount of resources as a state and nation allocated to preventative care compared to curative measures is almost imperceptible. However, if the disability rate remains constant between now and 2040, the economic challenges to the state will be overwhelming.

- A second mechanism to explore involves efforts to help individuals and their families to receive the support needed to delay or prevent the transition to Medicaid. Several recent

studies have identified the importance of supportive services, such as home-delivered meals, homemaker assistance, and transportation for groceries and medical appointments on the use of nursing homes by individuals with low care needs. The recent AARP Long-Term Services and Supports Score Card reported that 11.2% of Ohio's nursing home residents are considered to be low care, giving Ohio a ranking of 25th. The best state in the nation had a rate of 4.1%. Ohio has one of the strongest network of area agencies in the nation and while the supportive services available through the federal Older Americans Act are inadequate, it will be critical to continue to provide the resources for these agencies to target supportive services to those with moderate levels of disability and moderate income levels. Ohio is also fortunate to have a number of counties with tax levies that provide support for county organizations or the area agencies on aging to provide these services and the state should explore how to assist counties in using these resources to help individuals maintain social and financial independence. Our research on the levy programs indicates that counties have an incentive to shift higher care need participants to Medicaid and a system that works with these organizations to continue serving higher need individuals would be an important step forward.

- Ohio can embrace technology and environmental adaptation to help older people with disability to remain independent in the community. Computer processing power has increased and the true age of robotics will soon be here, with substantial potential impact in the key areas of transportation and personal care. Ohio already has established sectors of high technology; applying this innovation to elder issues is a potentially vital area of economic and social development that would not only fuel the state economy, but could also assist the state in providing assistance to a growing population. Other environmental adaptations to assist older people with disability to remain or return to the community have also been shown to be critical in maximizing independence. Some are small fixes, such as well-placed grab bars, others more complicated, such as mechanisms to help lift and transfer individuals with severe disability. Often times, caregivers report that it is these types of supports that allow them to continue to assist family members or friends.

- Even with technology, long-term services, regardless of setting, will remain a labor intensive and personal set of services. Ohio should continue efforts to better train and support the direct-care workforce. Our survey of nursing homes found an average retention rate of 66% of state trained nursing assistants; in some facilities those rates are below 20%, meaning that a large number of direct-care workers stay less than one year on the job. Wages and benefits, staffing patterns, organizational structure, market conditions, and a host of other factors have been shown to impact workforce quality and rates of turnover. However, our data show that even in similar labor markets, variation in retention rates are significant, suggesting that technical assistance and administrative and policy changes can have a considerable impact in this area. Statewide best practices initiatives, such as the one

38

being explored by the Ohio Department of Aging with the nursing home industry, are the kinds of efforts that need to be expanded across the long-term delivery system. In some instances, some of these innovative training approaches might prove useful for family and other informal caregivers.

- Nearly one in four Ohio nursing home residents are under the age of 60. About 45% of this group stays three months or less, suggesting that Medicaid has become a short-term rehabilitation funding source for younger participants. However, three in ten of the under-60 age group are nursing home residents for one year or more. This age group generally has lower overall rates of disability which has raised questions about the appropriateness of the nursing home setting for these individuals. As Ohio has expanded home- and community-based service options it has also made considerable effort to make sure individuals of all age reside in the appropriate settings. A recent evaluation of the Money Follows the Person program found that Ohio had the largest number of transitions in the nation in 2015 and 43% of those leaving the facilities were individuals with mental illness (Irvin et al., 2017). A comprehensive study of what contributes to length-of-stay for this age group is warranted.

- In the past two years Ohio has reduced the number of nursing home beds in the state and the number of individuals with severe disability who reside in a nursing home setting. For example, in 2011, 29% of older people with severe disability resided in Ohio nursing homes and in 2015 that proportion had dropped to 24%. However, as a state we still have, on a per capita basis, a higher supply of beds than most states and a higher proportion of older people that utilize institutional settings. For example, 14.4% of women age 85 and older reside in nursing homes in Ohio and the national average is 11.6%. The rate of women age 85 and older for Oregon is 3.8%. Creating an array of community supports for individual and families has allowed states to lower the use of nursing homes and Ohio needs to examine best practices used across the nation.

- As noted, the system of long-term services in Ohio has become considerably fluid in nature. The once held assumption that individuals progressed in linear fashion through the continuum of long-term services—from a community home to assisted living to nursing facility—is no longer the typical case. Individuals go from setting to setting in very different orders and under different circumstances. In order to track participant outcomes, it would be useful to have a common core of measures across long-term services settings. In order to ensure that the system is as cost-effective as possible, it is critical that common approaches to assessing level of need, use of services, and outcomes of service are developed and implemented. Right now it is difficult to compare the effectiveness of programs because different data are collected to characterize the population and different outcomes are used to assess program performance. Even when common measures are used

39

they are not collected in a standardized manner, making comparison across and sometimes within programs difficult. The demographic challenges of the future mean that our long-term services system will need to be as efficient and effective as possible. A better system of monitoring and measurement will be a key element of Ohio's improvement strategy.

- This dramatic increase in short-term nursing home stays has major implications for program policies and procedures. For example, in 1993 Ohio implemented an extensive pre-admission screen and resident review requirement for individuals being admitted to Ohio's skilled nursing facilities. At that time there was a concern that individuals were entering nursing homes inappropriately, without understanding possible home- and community-based service options. In 1993, when pre-admission screening was initially implemented, about 60% of those admitted continued to reside in the facility after three months, compared to 16%, 20 years later. This means that Ohio is spending a considerable amount of resources doing a pre-admission review for individuals who will stay only a short period of time. The challenge is that there are still individuals being admitted to skilled nursing facilities who could benefit from either the pre-admission screen or the resident review used to identify mental health needs of those being admitted. The program and policy question is how to do this as efficiently and effectively as possible. Additional work is required to determine how best to target and implement the pre-admission screen and resident review in a changed long-term services system.

- The large number of short-term residents also has financing, regulatory, and quality implications. The Ohio Department of Aging is already exploring changes to the resident and family satisfaction surveys based on these circumstances. But what other aspects of nursing home practice and policy are impacted by these changes? Should these changes alter regulatory strategies? Does Ohio need two types of inspection surveys, one focusing on short-term care and one focusing on long-stay residents? Another question involves the reimbursement approach. Medicaid has long been seen as the long-term public funding mechanism for nursing homes, while Medicare was the short-term rehabilitation funder of services. One surprising finding was that many Medicaid admissions are also for short-stays, with 72% of these individuals discharged within three months. Should there be a differing reimbursement rate for short- and long-term individuals using Medicaid? These changes suggest that a review of financing and regulatory policies are necessary.

In summary, Ohio has made considerable strides over the past two decades in changing the system of long-term services and supports. Once known for being a state where nursing home care was the primary option for older adults, Ohio is now serving more older people through the Medicaid home- and community-based service system than in nursing homes supported by Medicaid. Despite the progress, many challenges remain. But this report highlights the fact that state policy changes do indeed matter.

40

Ohio Department of Job and Family Services. (2013). *Medicaid Cost Report*. Columbus, OH: Ohio Department of Jobs and Family Services.

Payne, M., Applebaum, R., & Straker, J. (2012). *Locally funded services for the older population: A description of senior service property tax levies in Ohio*. Oxford, OH: Scripps Gerontology Center, Miami University. Retrieved from: https://sc.lib.miamioh.edu/bitstream/handle/2374.MIA/4470/Locally%20Funded%20Services%20for%20the%20Older%20Population_2012_Revised.pdf?sequence=1.

Pew Charitable Trust/MacArthur Foundation. (2013). *States' use of cost-benefit analysis: Improving results for taxpayers*. Washington, DC: Pew Charitable Trusts and MacArthur Foundation. Retrieved from: http://www.pewtrusts.org/~/media/legacy/uploadedfiles/pcs_assets/2013/pewresultsfirst50statereportpdf.pdf.

Reinhard, S., C., Accius, J., Houser, A., Ujvari, K., Alexis, J., & Fox-Grage, W. (2017). *Picking Up the Pace of Change, 2017: A State Scorecard on Long-Term Services and Supports for Older Adults, People with Physical Disabilities, and Family Caregivers* (pp. 1–67). AARP Public Policy Institute. Retrieved from: http://www.longtermscorecard.org/~/media/Microsite/Files/2017/Web%20Version%20LongTerm%20Services%20and%20Supports%20State%20Scorecard%202017.pdf.

Reinhard, S., C., Feinberg, L., F., Choula, R., & Houser, A. (2015). *Valuing the invaluable: 2015 update* (Insight on the Issues No. 104) (pp. 1–25). AARP Public Policy Institute. Retrieved from: http://www.aarp.org/content/dam/aarp/ppi/2015/valuing-the-invaluable-2015-update-new.pdf.

Ritchey, P., Mehdizadeh, S., & Yamashita, T. (2012). *Projections of Ohio's population 2010-2030*. Oxford, OH: Scripps Gerontology Center, Miami University. Retrieved from http://www.ohio-population.org/.

Scripps Gerontology Center, Miami University. (2014). *Projections of Ohio's population with disability by county, 2010-2030*. Oxford, OH. Retrieved from: http://www.ohio-population.org/.

Thomas, K., S., & Mor, V. (2013). The relationship between older Americans Act Title III state expenditures and prevalence of low-care nursing home residents. *Health Services Research*, *48*(3), 1215–1226. https://doi.org/10.1111/1475-6773.12015.

United States Census Bureau. (2016). 2015 ACS 1-Year PUMS. Bureau's American Community Survey Office. Web. 1 November 2016<https://www.census.gov/programs-surveys/acs/data/pums.html>.